THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, *v.* ARCHIE BANKS, Defendant-Appellant.

Third District    No. 80-294

Opinion filed March 25, 1981.

Robert Agostinelli and Michael Filipovic, both of State Appellate Defender's Office, of Ottawa, for appellant.

Edward F. Petka, State's Attorney, of Joliet (John X. Breslin and Terry A. Mertel, both of State's Attorneys Appellate Service Commission, of counsel), for the People.

Mr. JUSTICE BARRY delivered the opinion of the court:

Following a trial by jury in the circuit court of Will County, the defendant, Archie Banks, was convicted of two counts of aggravated battery (Ill. Rev. Stat. 1977, ch. 38, pars. 12—4(a), (b) (6)). He was subsequently sentenced to the Department of Corrections on one count for a term of three years. On appeal from his conviction, the defendant raises two issues for our consideration: First, did the trial court err in finding that there existed no bona fide doubt of the defendant's fitness to stand trial; and second, assuming that the trial court did not so err, did it nonetheless commit reversible error in refusing to grant defendant's pretrial request for a psychiatric examination. We do not believe either of these issues has merit, and accordingly affirm the defendant's conviction.

The incident giving rise to the information charging defendant with two counts of aggravated battery occurred on July 4, 1979. On that date the defendant, an inmate at Stateville Penitentiary serving concurrent five- to 15-year sentences for burglary, aggravated battery and attempt (rape), struck correctional officer Earl Jones several times about his face with his fists. As a result of the attack, Jones suffered internal damage to his right eye, two broken teeth, loosened teeth, and a broken partial denture. The two count information against Banks was filed in the circuit court of Will County in March of 1980.

On March 24, 1980, defendant's court appointed attorney, Raymond Bolden, filed a motion for a continuance and other relief, seeking to obtain, *inter alia*, the full and complete psychological records of defendant compiled by the Department of Corrections since defendant's incarceration in 1978. The motion was granted. At the hearing on the defense motion, the court asked attorney Bolden if he wished at that time to make a request for a psychiatric examination of the defendant. Attorney Bolden responded that he declined to make such a request before he had an opportunity to examine the Department's records.

Early in April Mr. Bolden was supplied with eight psychological and psychiatric reports compiled by the Department on defendant, Banks. The first was an undated Program Considerations Report by Viola

Leifheit, a counselor at the Joliet Correctional Center. In her report, Ms. Leifheit made a number of references to Banks' "bizarre" behavior during her interview with him, and described him as "[p]rimitive, hostile, impulsive, and possibly with a tenuous hold on reality." She also noted that according to his medical report the defendant had sustained a head injury when he was seven years old. She suggested that the defendant be given a psychiatric examination if his bizarre behavior should continue.

The next report was a psychological summary of defendant made by psychologist Dennis Becraft on October 5, 1978. Becraft noted that although defendant was able to read only at a third grade level, he was of estimated average intelligence. He found the defendant to be "primitive, poorly socialized, hostile, impulsive, and likely to make a very poor institutional adjustment." Becraft also noted that defendant admitted drug abuse.

The next report, dated September 6, 1979, was the first of four psychological reports made by psychologist Muhammed Irfan. The defendant was referred to Irfan because of reports that he had set fire to his shoes and had flushed all of his linen down the toilet. Because of these incidents he had been placed in controlled segregation. Initially, Irfan found the defendant to be oriented and relevant, although occasionally rambling. He complained of headaches and blackouts. When asked by Irfan why he was placed in segregation, Banks said it was because he was accused of striking an officer. He could not, however, give any explanation for his actions, claiming long-term drug abuse. Irfan recommended continued observation of the defendant, and referred him to a psychiatrist to determine the need for a neurological examination.

The psychiatrist to whom the defendant was referred was Dr. Meyer Kruglik, who, in a report dated September 17, 1979, revealed the defendant's long history of drug and alcohol abuse. When Dr. Kruglik asked the defendant why he had been placed in segregation, he responded that the correctional officers improperly pressured him and wrote untrue reports. The defendant then told Kruglik "they don't want me here so they should give me a passport." He also stated that the Army wanted him and he should be turned over to them (the defendant was AWOL at the time he committed the offenses for which he was imprisoned). He finally indicated a desire to be transferred to another penal institution.

On the basis of the foregoing, Dr. Kruglik made the following observations about Banks:

> "Although capable of recognizing that certain rules of law and conduct flow naturally from the precepts of a civilized society, he tends to the opinion that his own needs and his interpretation of these needs take precedence. When confronted with the concept

of individual responsibility, he shifts responsibility from himself to others or to circumstance. His thinking and judgment is immature, constricted and rigid; when this is coupled to his unwillingness to accept his own responsibility for his behavior, one could be led to wonder whether his reality testing has passed the borderline."

With regard to a neurological examination, Dr. Kruglik felt that the defendant's blackouts and headaches could be explained by his history of drug abuse and situational tensions. He did, however, recommend that Banks be given an electroencephalogram (EEG) to determine if an abnormal brain wave pattern was present. The doctor's final impression of Banks was "antisocial personality with schizoid features and a history of polydrug abuse."

Muhammed Irfan's second psychological report was dated October 10, 1979. After Dr. Kruglik examined Banks, he was discharged from controlled segregation. Shortly thereafter, however, he started another fire in his cell. This incident caused him to be referred again to Mr. Irfan for psychological consultation.

In his report, Irfan stated that he found Banks to be uncooperative during his interview. Much of the time he refused to speak. He refused to divulge any information about the fire incident, limiting his comments to "they said I set fire." He did, however, continue to demand that he be transferred to a regular cell. Irfan reported that Banks asked if he had received his EEG results, and upon being informed that they were negative, said "Just as I thought—talking to you we have not accomplished anything—so why should I talk with you." Mr. Irfan found Banks' orientation to be satisfactory, and noted that when he allowed Banks to converse spontaneously the defendant expressed no delusional thoughts. His impression of the defendant was identical with that of Dr. Kruglik, i.e., the defendant was an antisocial personality with schizoid characteristics and a history of polydrug abuse. Mr. Irfan further noted that "Mr. Banks appears totally unmotivated to change anything about him and it is reasonable to suspect that he has somewhat of a tenuous hold on the reality of his situation. He expects us to ignore his destructive and disruptive behavior completely." He recommended continued observation of the defendant.

One week later (October 17, 1979) Banks had a followup visit with Mr. Irfan. On this occasion, Irfan found Banks to be·fully oriented, with no evidence that his intellectual capacity was impaired. His responses to questions were well organized and detailed; a deviation, Irfan noted, from Banks' last interview performance. Irfan found that "[o]verall, Mr. Banks presented [himself] as an individual who could be held fully accountable for his behavior." He also found that Banks was unwilling to admit that he dealt with disagreeable situations in an "abrupt and

impulsive" style, and that he continued to believe that he was the victim, rather than the cause, of his own problems. Irfan concluded that "I get the impression that we are dealing with a man who takes a very limited perspective relative to administrative actions taken by those in authority and misinterprets such action for 'they have been messing up with me.' " He did not believe any further psychological or psychiatric exams were necessary.

On January 4, 1980, Banks was again referred to Mr. Irfan because he had once more been setting fires in his cell. Because Mr. Irfan's report is particularly enlightening, we will recite verbatim a substantial portion of it below:

"When seen today, he [Banks] refuses to sit when invited and stares about the room, avoiding eye contact with me. From his nonverbal responses, it is clear that he understands my questions as his gestures bear relevance to my questions. In spite of my persistent effort to get him to respond verbally to me, I fail. This continues for a while and then, suddenly, Mr. Banks points toward the report that I have in front of me and points towards his ear which I interpret as his wish to hear what the report says about him. Once again, I politely ask him to take a seat but he refuses. With consistency, he continues to make gestures, suggesting that I read the report to him. Noting that I am not making any headways with him, I terminate the interview.

Basically, I am going to say what I have said before. Mr. Banks is an immature, rigid, socially inept delinquent who is a sneak and an ardent manipulator. What we have in him is a man who is quite selective in what he says and to whom. Immediately before entering my office where he maintained complete silence, he had asked the sergeant for a cigarette. I am also aware that he has been talking with other individuals whenever he wished. The nature of these conversations suggests that he is aware of his surroundings. He has been monitored in our Unit and he has been eating and sleeping adequately. Since his arrival here, he has not started any fire or otherwise acted in a manner suggesting psychopathology.

Although there have been questions regarding Mr. Banks' ability to test the reality of his circumstances, I am of the opinion, and perhaps I am alone in doing so, that he is well capable of performing in an appropriate manner. In reality, little can be done to save him from himself. * * *."

The final report was that of psychiatrist Kruglik, dated January 24, 1980. During his interview with defendant, Banks responded to Kruglik's questions solely by gesturing. Kruglik reported that he then remarked to Banks that "he need not play the game of remaining voiceless with him at

which he can't repress a smile as he points to his throat and shakes his head again." Dr. Kruglik concluded that he was of the opinion Banks was not mentally ill, and that his conduct was not the result of a mental illness.

On April 18, 1979, this case was called for trial. Before the trial could begin, defense attorney Bolden moved for the appointment of a psychiatrist to examine the defendant for the purpose of determining his fitness to stand trial. Bolden based his motion upon the inconclusive nature of the Department's psychological and psychiatric reports on the subject of Banks' competency, and upon the difficulties he personally had encountered in communicating with the defendant. Bolden informed the court that he had talked with Banks on numerous occasions, but "[t]his morning when we got together, quite frankly, our communication was, in my judgment, the worst its ever been at all. He keeps pointing to his neck indicating something." The court denied the defense motion, noting that two doctors had not found anything wrong with the defendant and further examination would be pointless. The case was continued to April 28.

On April 29, 1980, the defendant's jury trial began. Following the State's case in chief, the defendant's attorney moved the court to suspend the proceedings and to hold a hearing to determine the defendant's competency. In support of his motion he stated that prior to trial the defendant had been unwilling or unable to discuss the case with him, and at one point made an unusual gesture to his throat. Attorney Bolden also brought to the court's attention the defendant's bizarre behavior in the courtroom (during the course of the trial the defendant either sat or kneeled against a wall, and at one point came within seven feet of the jury and waved to them). He stated that because of defendant's behavior he could not allow him to testify "because I am not sure what he will do or say." The court, however, denied the defendant's motion, stating that it appeared that the defendant knew what was going on and could cooperate with counsel had he the inclination to do so. The defense rested without putting on any evidence, and the defendant was ultimately convicted of aggravated battery.

■■ The first issue raised on appeal involves the correctness of the trial court's decision denying the defendant's mid-trial request for a fitness hearing. Section 104—11(a) of the Code of Criminal Procedure of 1963 provides that the issue of a criminal defendant's fitness to stand trial may be raised by the defense, the State, or the court *sua sponte* before, during, or after trial. A fitness hearing shall be held whenever a *bona fide* doubt of the defendant's fitness to stand trial is raised. (Ill. Rev. Stat., 1979 Supp., ch. 38, par. 104—11(a).) "Whether a *bona fide* doubt has been raised is a decision resting largely within the discretion of the trial court." (*People v. Murphy* (1978), 72 Ill. 2d 421, 426, 381 N.E.2d 677, 682.)

Because under Illinois law a defendant is not considered unfit to stand trial if he is able to understand the nature and purpose of the proceedings against him and is able to assist in his own defense (Ill. Rev. Stat., 1979 Supp., ch. 38, par. 104—10), "[t]he critical inquiry is thus whether the facts presented a *bona fide* doubt that defendant possessed the two qualities necessary to make him fit for trial." *Murphy*, 72 Ill. 2d 421, 428, 381 N.E.2d 677, 682.

■■ On the basis of the record before us, we do not believe the trial court abused its discretion in concluding at the close of the State's case that no *bona fide* doubt existed as to either the defendant's ability to understand the nature and purpose of the trial or his ability to assist attorney Bolden in his own defense. Clearly, the assertions made by Bolden that he could not communicate with Banks and was finding him to be uncooperative were made in good faith. We do not question the sincerity of Bolden's personal belief that there existed a doubt as to Banks' competency. However, Bolden's beliefs are not to be given greater weight than the findings of the trial court. The court had an equal opportunity to observe the defendant's behavior in the courtroom, and concluded that it was either feigned or not indicative of an inability on defendant's part to understand the proceedings and/or assist in his own defense. This conclusion finds ample support in the defendant's psychological and psychiatric records. Although the defendant has obvious psychological problems, they are not of such a nature and magnitude that they render him incompetent for purpose of standing trial. As the supreme court pointed out, " '[f]itness speaks only to a person's ability to function within the context of trial.' [Citations.] It does not refer to sanity or competence in other areas. A defendant may be fit for trial although his mind may be otherwise unsound." (*People v. Murphy* (1978), 72 Ill. 2d 421, 432, 381 N.E.2d 677, 682.) We cannot say as a matter of law that the trial court was in error when it observed that the defendant was aware of what was going on in the courtroom, and was not unable, but merely disinclined, to cooperate with counsel. (See *People v. Jackson* (1980), 84 Ill. App. 3d 172, 414 N.E.2d 1175.) Accordingly, we hold that the court did not abuse its discretion in denying the defense motion for a fitness hearing.

■■ The second issue raised by the defendant on appeal is whether the lower court erred in denying his request for a pre-trial psychiatric examination. Section 104—11(b) of the Code of Criminal Procedure of 1963 provides that "[u]pon request of the defendant that a qualified expert be appointed to examine him or her to determine prior to trial if a bonafide doubt as to his or her fitness to stand trial may be raised, the court, in its discretion, may order an appropriate examination." (Ill. Rev. Stat., 1979 Supp., ch. 38, par. 104—11(b).) Although we cannot deny that attorney Bolden's request for a psychiatric examination of defendant

Banks was made in good faith and not frivolous, we do not believe that this fact alone should mandate the appointment of a psychiatrist for the purpose of determining whether a *bona fide* doubt as to defendant's fitness may be raised. (But see *Rose v. United States* (8th Cir. 1975), 513 F.2d 1251.) To so hold would be to divest the trial court of the discretion afforded to it under section 104—11(b). The appropriateness of the trial court's decision in such matters is to be examined in light of all the facts within the trial court's knowledge at the time it acts upon the defendant's request.

At the time the court ruled on Banks' motion, it was apprised of not only the difficulties attorney Bolden had encountered in obtaining the cooperation of his client, but also of the contents of the eight Department of Corrections reports which we have previously recited in some detail. The only psychiatrist to examine Banks, Dr. Kruglik, concluded unequivocally in his second report that Banks was neither mentally ill nor was his conduct the result of a mental illness. His problem was essentially psychological. Further, as Mr. Irfan made so abundantly clear, his particular psychological dysfunction did not prevent him from communicating or cooperating when he had the desire to do so and when it suited his purpose. On these facts, we cannot say the court abused its discretion in finding that yet another psychiatric examination of defendant would be pointless, and in refusing the defendant's pretrial request for such an examination.

For these reasons, we affirm the judgment of the circuit court of Will County.

Judgment affirmed.

SCOTT, P. J., and ALLOY, J., concur.