(No. 77569.—

THE PEOPLE OF THE STATE OF ILLINOIS, Appellee, v. JONATHAN HAYNES, Appellant.

*Opinion filed October 24, 1996.—Rehearing denied December 2, 1996.*

206

208

FREEMAN, J., joined by MILLER and McMORROW, JJ.,. concurring in part and dissenting in part.

Rita A. Fry, Public Defender, of Chicago (Richard E. Gade, Assistant Public Defender, of counsel), for appellant.

James E. Ryan, Attorney General, of Springfield, and Jack O'Malley, State's Attorney, of Chicago (Arleen C. Anderson, Assistant Attorney General, of Chicago, and Renee Goldfarb and Peter D. Fischer, Assistant State's Attorneys, of counsel), for the People.

CHIEF JUSTICE BILANDIC delivered the opinion of the court:

The defendant, Jonathan Haynes, was indicted on three counts of murder (720 ILCS 5/9—1(a)(1), (a)(2), (a)(3) (West 1992)) and one count of burglary (720 ILCS 5/19—1 (West 1992)) arising out of the August 6, 1993, shooting death of Dr. Martin Sullivan in Wilmette, Illinois. Following a bench trial in the circuit court of Cook County, the defendant was found guilty on all counts. The defendant waived a jury for death sentencing. The trial court found that the defendant was eligible for the death penalty. 720 ILCS 5/9—1(b)(6), (b)(11) (West 1992). The trial court further found that there were no mitigating factors precluding imposition of the death penalty and, accordingly, sentenced the defendant to death. The defendant's death sentence has been stayed pending his direct appeal to this court. 134 Ill. 2d Rs. 603, 609(a). We now affirm the defendant's convictions for intentional murder and burglary and sentence.

## FACTS

Prior to the defendant's trial, a hearing was held to determine the defendant's fitness to stand trial. The defendant waived a jury for this hearing, and the hearing proceeded before the trial judge. Expert witnesses testified on behalf of both the State and the defendant. The testimony given by these witnesses is discussed in detail later in this opinion. After hearing the evidence, the trial court ruled that the defendant was fit to stand trial.

Immediately after the trial court ruled on the defendant's fitness, the defendant informed the court that he wished to proceed without counsel. The trial court accepted the defendant's waiver of counsel and appointed two assistant public defenders to act as standby counsel. The defendant proceeded to represent himself at his trial and death sentencing hearing. The defendant waived a jury for trial.

At trial, the defendant admitted murdering Dr. Martin Sullivan. The defendant delivered an opening statement in which he condemned "fake Aryan cosmetics," in particular, bleached blond hair, blue tinted contact lenses and plastic surgery. The defendant further stated that, in committing his "murders," he had issued a challenge to society to act "in accordance with your stated ideals of human equality."

The State's evidence established that, at approximately 2:15 p.m. on August 6, 1993, a man who identified himself as "John Rothmann" entered the office of plastic surgeon Dr. Martin Sullivan in Wilmette, Illinois. This "John Rothmann" had earlier contacted the office and scheduled an appointment for this time with Dr. Sullivan to discuss undergoing a rhinoplasty. Witnesses in the office later identified the defendant as the man who had identified himself as "John Rothmann." After sitting in the waiting area, the defendant was shown into examination room 1, a room with only one door. Dr. Sullivan entered examination room 1 shortly

after the defendant. Several minutes later, office employees heard loud noises, including "popping" noises and glass shattering coming from examination room 1. The door to examination room 1 opened and the defendant ran out of the room and out of the office suite. Dr. Sullivan stumbled bleeding out of examination room 1 and asked someone to call an ambulance because he had been shot. An ambulance arrived at the scene a few minutes later and transported Dr. Sullivan to the hospital. Dr. Sullivan died as a result of his injuries. An autopsy revealed that Dr. Sullivan had sustained three gunshot wounds to the chest and a graze wound to the head. The shots had been fired at close range, from 18 to 24 inches away.

On the evening of August 6, 1993, Mitchell Lifson, an administrative aide for State Representative Jeff Schoenberg, saw a television news report of the Sullivan murder. The report identified the perpetrator as "John Rothmann" and included a description of the man. Lifson recalled that, at approximately 10:45 a.m. that day, the defendant, using the name "John Rothmann," had come into Representative Schoenberg's office and spoken to Lifson. The Representative's office is located about three or four blocks from Dr. Sullivan's office. Lifson told the defendant that the Representative was not available and asked for the defendant's name. The defendant was hesitant to divulge his name, though he eventually did identify himself as "John Rothmann," and refused to leave his telephone number. When Lifson spoke to Representative Schoenberg about the defendant a short time later, the Representative told Lifson to obtain the defendant's license plate number if possible.

Lifson left the office at about 12:15 p.m. As he was leaving, he noticed the defendant standing next to a light-blue Volkswagen Beetle with Maryland license

plates. Lifson wrote down the license plate number. Thereafter, when Lifson heard on the news that police were looking for a "John Rothmann," he contacted Wilmette police and gave them his information. Lifson identified the defendant as the man who had come to the Representative's office on August 6, 1993.

The name "John Rothmann," a description of his vehicle with the license plate number and a police sketch were distributed to local police agencies. In the early morning hours of August 8, 1993, a Skokie police officer observed a vehicle that matched the distributed description and license plate number driven by a white male. The officer stopped the vehicle and the driver identified himself as Jonathan Haynes. The officer identified the defendant as the man driving the car.

The defendant was taken into custody by Wilmette police. After being read *Miranda* warnings, the defendant requested a pen and some paper so that he could write a statement. The defendant also gave an oral statement to Wilmette police detectives. In that statement, the defendant stated that he telephoned Dr. Sullivan's office on August 3 or 4, 1993, and made an appointment for August 6, 1993, at 2:15 p.m. under the name "John Rothmann." The defendant described that he arrived in Wilmette at around noon on August 6 and first went to Representative Schoenberg's office. The defendant wanted to ask the Representative some questions about problems he perceived in society. After leaving the Representative's office, the defendant drove to a gas station located next to Dr. Sullivan's office and parked his car in that lot. At almost exactly 2:15 p.m., the defendant left his car and walked to Dr. Sullivan's office. The defendant related that, upon entering the office, he identified himself as John Rothmann and filled out patient identification forms using that name. He was shown into an examination room at about 2:50 p.m.,

where he waited for Dr. Sullivan for approximately 10 minutes. After Dr. Sullivan walked into the room and introduced himself, the defendant pulled out a gun and started shooting at him. The defendant stated that the gun was a blue steel Colt .38 Special revolver. After the first shot, Dr. Sullivan reached for the gun and the two men grappled for it. The defendant stated that he pulled the trigger seven times, firing six rounds. After the last shot, the defendant ran out of the examination room and out of the office. The defendant ran back to his car and drove away. The defendant described in his statement that he had planned an escape route and he sketched the detectives a diagram of that route. The defendant also stated that he had deliberately chosen a parking spot which allowed him a quick escape.

The defendant further related, in this statement, his reason for choosing Dr. Sullivan. The defendant said that he had decided to kill a plastic surgeon and Dr. Sullivan had the largest advertisement in the Yellow Pages. The defendant relayed that he had waited to shoot Dr. Sullivan in his office so that he could be sure that he killed the right person. The defendant also told police that he had arrived in the Chicago area about a month earlier for the express purpose of killing Charles Stroupe, who lived in Lake Forest, Illinois. The defendant desired to kill Stroupe because he was the president of Wesley Jensen Corporation, which, according to the defendant, was the original and largest manufacturer of blue tinted contact lenses. The defendant told police that he had conducted surveillance of Stroupe's home, and had attempted to kill Stroupe on August 2, 1993, but had been unable to perpetrate the killing. As a result, the defendant decided to target a plastic surgeon instead. The defendant stated that he remained in the Chicago area after killing Dr. Sullivan so that he could again attempt the murder of Stroupe. Finally, the

defendant relayed that his purpose in killing Dr. Sullivan and in trying to kill Stroupe was to strike out against those who promoted "fake Aryan beauty."

The defendant's written statement was also read into evidence. In addition to confessing to the murder of Dr. Sullivan and the attempted murder of Charles Stroupe, the written statement included the defendant's confession to the 1987 murder of Frank Ringi in San Francisco, California. Ringi, the defendant described, was a hair colorist. In that statement, the defendant again described his motivation for the murders as the condemnation of fake Aryan cosmetics. The defendant also stated that he had "fallen in love" with the "beauty of the Hitler youth" at the age of 12, and that he was "fundamentally in sympathy" with the neo-Nazi movement.

Police searched the defendant's car and apartment. Inside the car, police recovered a page torn from the Yellow Pages, which contained Dr. Sullivan's advertisement. In the apartment, the police found a loaded pistol, later identified through forensic testing as the murder weapon. Also found in the apartment was a cassette tape marked "taped confession," which was played at trial. In this tape, the defendant stated that he had killed two persons and that he was "quite happy" with the murders. The tape was meant to be sent to cosmetics industry executives to warn them against perpetuating fake Aryan cosmetics. The police also found the defendant's diary, the contents of which were read into evidence. Therein, the defendant detailed his plans to kill Charles Stroupe and described that he had killed Dr. Sullivan.

The defendant presented no evidence at trial, other than his own testimony. In that testimony, the defendant admitted killing Dr. Sullivan and again reiterated that his motivation was to make a statement condemn-

ing fake Aryan cosmetics. The defendant explained that "we fought World War II against the reality of Aryan beauty and now we are trying to fake it with cosmetics." The defendant also made a closing argument in which he again confessed to the murders of Dr. Sullivan and Frank Ringi.

The trial court found the defendant guilty as charged in the indictment of intentional murder (720 ILCS 5/9—1(a)(1) (West 1992)), knowing murder (720 ILCS 5/9—1(a)(2) (West 1992)), felony murder (720 ILCS 5/9—1(a)(3) (West 1992)), and burglary. The defendant waived a jury for the capital sentencing hearing. The trial court found that the defendant was eligible for death on two grounds: (1) that the defendant had committed the murder in the course of another felony, burglary (720 ILCS 5/9—1(b)(6) (West 1992)), and (2) that the murder was committed in a cold, calculated and premeditated manner pursuant to a preconceived plan (720 ILCS 5/9—1(b)(11) (West 1992)). The State thereafter presented evidence in aggravation.

Dr. Mathew Markos, a psychiatrist, testified for the State. Dr. Markos stated that he had considered whether the defendant had committed the murder of Dr. Sullivan while he was under the influence of an "extreme mental or emotional disturbance," the standard under the statutory mitigating factor contained in section 9—1(c)(2) of the death penalty statute (720 ILCS 5/9—1(c)(2) (West 1992)). In Dr. Markos' opinion, the defendant was not operating under the influence of any such disturbance at the time of the murder.

Thomas Trulli also testified for the State in aggravation. Trulli was the life companion and business partner of Frank Ringi. Trulli identified the defendant as the man who, identifying himself as "John Rockman," had entered their San Francisco hair salon on May 27, 1987, for a consultation with Ringi. After the defendant

entered the consultation room with Ringi, Trulli heard Ringi shout and heard three "popping" sounds. Trulli entered the room and the defendant shot him in the abdomen. Ringi had fallen to the floor. As a result of the shooting, Trulli was in surgery for 17 hours and was hospitalized for three weeks. Ringi died as a result of the shooting. Following the murder, business at the salon declined to the point where Trulli was forced to file for corporate bankruptcy.

The defendant's confession to the murder of Frank Ringi, given to San Francisco police detectives after the Sullivan shooting, was also entered into evidence. Therein, the defendant admitted that he went to Ringi's salon on May 27, 1987, in order to kill him. He killed Ringi because he advertised himself as a hair colorist. The defendant stated that he was "not repentant" for this crime, although he knew that it was against the law. The defendant also stated in this statement that he believed that "Jews" wanted to control this country and that the population was growing increasingly uglier. The defendant also relayed that he is a "loner" and does not affiliate with any groups.

The State also presented testimony from Detective Brian King of the Wilmette police department. Detective King testified that the defendant said that it was his plan, after he had committed three murders, to send newspaper accounts of those murders to fashion magazines.

The State presented evidence that the defendant had been employed as a chemist with the Federal Bureau of Alcohol, Tobacco and Firearms in Maryland from November 17, 1991, to March 26, 1993. In addition, a certified copy of the defendant's birth certificate, showing his date of birth as October 3, 1958, was admitted into evidence.

Finally, the written statements of Dr. Sullivan's wife

and seven of his eight children were read into evidence. In those statements, Dr. Sullivan was described as a caring father and husband, and a strong role model for his children and 21 grandchildren. Those statements also relayed that Dr. Sullivan's practice specialized in the repair of cleft lips and palates in infants. Dr. Sullivan also performed reconstructive surgery on accident victims and had performed charity work for the past 32 years. According to the statements, Dr. Sullivan was 68 years old when he died, was in very good health and planned to retire soon.

With this evidence, the State rested in aggravation. The trial court thereafter gave the defendant time to consult with standby counsel and with his parents. After this consultation, the defendant informed the court that he wished to present no mitigation evidence other than his own statement. The defendant gave a very brief statement in which he again condemned fake Aryan cosmetology.

The trial court denied standby counsel's request that the court consider a memorandum of mitigation evidence and a letter from Dr. Karen Smith offered in mitigation. Those documents are contained in the record. The mitigation memorandum, prepared by the public defender's office, urged that the statutory mitigating factor of "extreme mental or emotional disturbance" (720 ILCS 5/9—1(c)(2) (West 1992)) was present. Dr. Smith's letter concluded that the defendant suffered from paranoid schizophrenia at the time of the crime and was therefore legally insane when he committed the crimes.

After hearing the evidence, the trial court ruled that there were no mitigating circumstances sufficient to preclude a sentence of death. The trial court accordingly sentenced the defendant to death.

## ANALYSIS

Fitness Hearing

*Waiver of Jury for Fitness Hearing*

The defendant charges that the trial court committed reversible error in accepting his waiver of a jury for the fitness hearing. We find no error in this regard.

The defendant's fitness hearing was set to begin on March 2, 1994. At the start of proceedings on that date, defense counsel appeared for the defendant and stated that a jury had been requested for the hearing. One of the prosecutors then informed the trial judge that the defendant had indicated, during one of his fitness examinations, that he wished to proceed without a jury. The trial judge questioned the defendant on this issue:

"THE COURT: *** I am going to ask him. You have a right, not a constitutional right, Mr. Haynes, to have this issue concerning whether you are legally competent mentally to stand trial in this criminal case to be decided by a jury of six persons, this is a civil proceeding, or whether you want to present—whether that issue can be presented to the Court sitting without a jury.

The decision is yours to make, and I am asking you to make that decision. Do you want six people seated in this jury box to hear evidence from your doctors and other persons concerning your mental status and your legal competence to stand trial, or do you want to have the Court make that decision without the jury?

Tell me.

THE DEFENDANT: I wish the Court to make that decision."

The defendant thereafter executed a written waiver of a jury for the fitness hearing. The defendant now contends that the trial court incorrectly accepted his jury waiver when defense counsel had already demanded a jury for the proceeding.

There is no constitutional right to a jury at a hearing to determine fitness to stand trial. *People v. Man-*

*ning*, 76 Ill. 2d 235, 239 (1979). Our legislature, however, has made provisions for a jury to determine the issue of a defendant's fitness under some circumstances. 725 ILCS 5/104—12 (West 1992). Section 104—12 of the Code of Criminal Procedure of 1963 provides:

> "Right to Jury. The issue of the defendant's fitness may be determined in the first instance by the court or by a jury. *The defense* or the State may demand a jury or the court on its own motion may order a jury. However, when the issue is raised after trial has begun or after conviction but before sentencing, or when the issue is to be redetermined under Section 104—20 or 104—27, the issue shall be determined by the court." (Emphasis added.) 725 ILCS 5/104—12 (West 1992).

The defendant's argument rests upon the wording of this statutory provision. The defendant asserts that section 104—12, by use of the term "the defense," gives the right to demand or waive a jury to defense counsel and not to the defendant himself. In most cases, the defendant reasons, defense counsel's decision on this issue will coincide with the defendant's wishes. However, the defendant posits, in the rare situation such as that presented here, where defense counsel has demanded a jury and the defendant expresses a desire to waive a jury, defense counsel's decision predominates. In essence, the defendant argues that the defendant does not personally have the right to waive a jury for the fitness determination. The defendant's contention is without merit.

This court has held "[i]t is clear that an accused may waive a jury in a proceeding to determine his competency." *People v. Lyons*, 42 Ill. 2d 437, 440 (1969); see also *People v. Brown*, 43 Ill. 2d 79, 82 (1969). The defendant acknowledges this holding and concedes that, at the time of that holding and up until the legislature enacted the current version of the fitness jury statute in 1979, a defendant had the statutory right to waive a jury for his fitness hearing. He argues, however, that

the legislature altered that rule in enacting the current version of section 104—12.

The defendant emphasizes that, prior to the 1979 change, the fitness jury provision provided that "the defendant" (in addition to the State or the court) could demand a jury. Ill. Rev. Stat. 1977, ch. 38, par. 1005—2—1(d). In 1979, the section was changed to provide, as noted above, that "the defense" may demand a jury. The defendant contends that, in substituting "the defense" for "the defendant," the legislature intended to take away from the defendant the right to demand or waive a jury and to give that right to defense counsel instead. The defendant's interpretation of the statute is erroneous.

In construing a statute, a court's duty is to ascertain and give effect to the intent of the legislature. *People v. Parker*, 123 Ill. 2d 204, 209 (1988). In determining that intent, a court must look first to the language of the statute and interpret that language in accordance with its plain and ordinary meaning. *People v. Ross*, 168 Ill. 2d 347, 350 (1995). We find that the plain and ordinary meaning of the phrase "the defense," as used in section 104—12, does not exclude the defendant. "The defense," as used in this context, is commonly considered to connote the "team" or the "side" that is defending. This definition does not exclude the defendant, but clearly encompasses him as a part of "the defense team." We note that, in other sections of article 104 of the Code of Criminal Procedure, the article pertaining to fitness matters, the legislature expressly referred to "the attorney for the defendant" or "defendant's counsel" where it sought to refer to defense counsel. See 725 ILCS 5/104—23(a), 104—27(c) (West 1992). Had the legislature intended, in section 104—12, to grant the right to demand or waive a jury solely to defense counsel, to the exclusion of the defendant, it would have used specific

language to that effect. We thus conclude that the plain language of section 104—12 does not evince an intent to alter the defendant's right to demand or waive a jury for the fitness determination.

The legislative history surrounding the 1979 change in the fitness jury provision confirms our conclusion. This change was effected as part of a major overhaul of the statutory provisions governing fitness for trial and sentencing. Public Act 81—1217, effective December 28, 1979, repealed previous provisions regarding fitness (Ill. Rev. Stat. 1977, ch. 38, pars. 1005—2—1, 1005—2—2), and replaced them with sections 102—21 and 104—10 through 104—29 of the Code of Criminal Procedure. The new sections provided detailed procedures to be employed in determining fitness and dealing with unfit defendants. Thus, changing "the defendant" to "the defense" was not the only, and was certainly not the most significant, change wrought by Public Act 81— 1217.

Moreover, the debates in the legislature leave little doubt as to the motivating factor behind the legislative overhaul. The legislators' comments reveal that the primary purpose of the act was to address situations such as that in the much-publicized case of Donald Lang. This court issued an opinion in Lang's case in May 1979. *People v. Lang*, 76 Ill. 2d 311 (1979). As noted in that opinion, Lang was an illiterate deaf-mute with virtually no communicative abilities who, over the course of 14 years, had been twice charged with murder, but had been found unfit for trial and not civilly committable. According to the House debates, Public Act 81—1217 was the result of the Lang case and was intended to bridge a "glaring gap" in the statutory framework for dealing with unfit defendants. 81st Ill. Gen. Assem., House Proceedings, June 19, 1979, at 75 (statements of Representative Daniels). Under the then-existing

framework, persons such as Lang went into a "procedural limbo," and the bill was intended to alleviate that problem by creating "a comprehensive statute that covered defendants who are found not fit to stand trial and sets up a series of hearings and treatments for such persons." 81st Ill. Gen. Assem., House Proceedings, July 1, 1979, at 61 (statements of Representative Daniels).

Accordingly, the relevant legislative history provides no support for the defendant's interpretation of section 104—12. The 1979 act was primarily intended to address the concerns raised by the Lang case. According to this court's opinion in that case, it does not appear that the Lang case involved any issue relating to the waiver of a jury for fitness. We thus find no basis for holding that, in changing "the defendant" to "the defense," the legislature sought to effect the change suggested here by the defendant. The more rational explanation for this very minor change in wording is that the drafters used the word "defense" to allow defense counsel to speak on the defendant's behalf to inform the court of the *defendant's wishes* on this issue. We therefore reject the defendant's contention that section 104—12 grants only defense counsel, and not the defendant, the right to demand or waive a jury.

The defendant nonetheless argues that logic compels the rule he proposes. The defendant asserts that, where a *bona fide* doubt of a defendant's fitness has been raised (as there must be for a fitness hearing to take place), it is not logical to allow that potentially unfit defendant to personally make the decision whether to have a jury decide his fitness. This court rejected this precise argument in *People v. Brown*, 43 Ill. 2d 79, 82 (1969), stating:

> "Defendant asserts, however, that it is inconsistent to try a person's competency to stand trial and at the same time accept his tendered jury waiver as being understandingly made. This argument has some surface appeal, but we do not think it makes a tendered jury waiver a nullity

as defendant contends. The other side of the coin is that it would be reversible error for the trial court to deny a competent defendant's jury waiver." *Brown*, 43 Ill. 2d at 82.

The defendant acknowledges the holding in *Brown*, but urges a different result here. We see no reason not to adhere to the *Brown* court's resolution of this issue. The defendant concedes that, up until 1979, the legislature expressly granted defendants in this situation the right to demand or waive a jury, apparently finding no lack of logic in that procedure. We have held that the 1979 change in the fitness jury statute did not take away that right. We therefore continue to adhere to the *Brown* court's rejection of this argument. We find no inherent inconsistency in upholding the legislature's grant to defendants of the right to decide whether a jury will determine their fitness for trial.

In a related argument, the defendant contends that the acceptance of his jury waiver was improper because it was based upon the trial judge's "unsubstantiated personal belief" that the defendant's judgment was not impaired even if he was mentally ill. Having found that the defendant possessed the statutory right to decide whether to have a jury determine fitness, we agree with the State that there is no need to consider the trial court's "reason" for accepting the defendant's waiver. Accordingly, we hold that the trial court properly held the defendant's fitness hearing without a jury.

### Fitness Finding

The defendant next contends that the trial court's ruling that he was fit to stand trial must be reversed. The defendant makes several arguments in this regard.

### A. Manifest Weight of the Evidence

The defendant asserts that the trial court's ruling on fitness was against the manifest weight of the evidence. We find the evidence was sufficient to support the finding of fitness.

The due process clause of the fourteenth amendment prohibits the prosecution of a defendant who is not fit to stand trial. *Medina v. California*, 505 U.S. 437, 439, 120 L. Ed. 2d 353, 359, 112 S. Ct. 2572, 2574 (1992); *People v. Brandon*, 162 Ill. 2d 450, 455 (1994). Under Illinois law, a defendant is presumed to be fit to stand trial, and will only be considered unfit if, because of his mental or physical condition, he is unable to understand the nature and purpose of the proceedings against him or to assist in his defense. 725 ILCS 5/104—10 (West 1992); *People v. Eddmonds*, 143 Ill. 2d 501, 512 (1991). Fitness speaks only to a person's ability to function within the context of a trial; a defendant may be fit to stand trial even though his mind is otherwise unsound. *Eddmonds*, 143 Ill. 2d at 519. If a *bona fide* doubt of the defendant's fitness is raised, the trial court has a duty to hold a fitness hearing before proceeding further. 725 ILCS 5/104—11(a) (West 1992); *Brandon*, 162 Ill. 2d at 456. The trial court's ruling on the issue of fitness will be reversed only if it is against the manifest weight of the evidence. *People v. Mahaffey*, 166 Ill. 2d 1, 18 (1995).

At the fitness hearing in this case, defense counsel agreed that there was no dispute that the defendant understood the nature and purpose of the proceedings against him. Rather, the dispute centered on the second part of the fitness inquiry, whether the defendant had the capacity to assist in his defense. 725 ILCS 5/104—10 (West 1992). The testimony at the fitness hearing is summarized below.

Dr. Mathew Markos, a licensed forensic psychiatrist and acting clinical director of the Psychiatric Institute of the Circuit Court of Cook County (Psychiatric Institute), testified for the State. Dr. Markos testified that he had previously conducted examinations to determine fitness for trial or sanity thousands of times. Dr. Markos met with the defendant, pursuant to court

orders, on four occasions between August 27, 1993, and February 15, 1994. Dr. Markos testified that, during his meetings with the defendant, the defendant was calm and cooperative, exhibiting good eye contact and no anxiety. Dr. Markos specifically looked for looseness of association and delusions on the part of the defendant, but saw no evidence of such symptoms. Dr. Markos discussed the defendant's "philosophy" with him and determined that his beliefs regarding Aryan supremacy did not constitute a delusion in the psychiatric sense. Rather, the defendant's philosophy, Dr. Markos determined, was a highly personalized idiosyncratic belief.

Dr. Markos diagnosed the defendant as suffering from a personality disorder with schizoid, narcissistic and paranoid traits, which does not constitute a mental illness or mental disorder. Using the criteria set forth in the Diagnostic and Statistical Manual of Mental Disorders (Third Edition-Revised) (DSMIII-R), Dr. Markos concluded that the defendant was not suffering from schizophrenia. The DSMIII-R requires that, for a diagnosis of schizophrenia, there must be the presence of at least two symptoms, and one of those must be a prominent delusion. The defendant exhibited no delusions or delusional thinking. Neither did the defendant exhibit other symptoms of schizophrenia, such as hallucinations, catatonia or incoherence.

Dr. Markos further testified that, according to his medical records, the defendant had been treated with various antipsychotic drugs while in custody. There was, however, no change in the defendant's beliefs as a result of the medications. According to Dr. Markos, a true psychiatric delusion would be amenable to treatment with medications. Dr. Markos conceded that drugs will not always cure a delusional disorder.

Dr. Markos acknowledged that Drs. Fauteck and Rabin, also of the Psychiatric Institute, had diagnosed

the defendant as schizophrenic. Dr. Markos took these opinions into account in reaching his own diagnosis. Dr. Markos also acknowledged that other doctors had diagnosed the defendant as suffering from delusional disorder. Dr. Markos testified that the symptoms described by those doctors did not support a diagnosis of delusional disorder, without the additional symptom of a psychiatric delusion. Dr. Markos never personally observed any of the symptoms described in the records of those other doctors.

Based upon all of this information, Dr. Markos found the defendant fit to stand trial. In Dr. Markos' opinion, the defendant understood the charges against him and had the capacity to cooperate with counsel if he so chose. The defendant had simply chosen not to cooperate with counsel and had very clearly articulated that he wished to represent himself.

The defendant's first witness at the fitness hearing was Assistant Public Defender Thomas Verdun. Verdun was assigned to represent the defendant at his August 9, 1993, bond hearing. Verdun interviewed the defendant for 20 to 30 minutes, during which time the defendant never looked directly at him. While in court at that hearing, the defendant interrupted the judge in order to make a statement condemning "fake Aryan beauty." The defendant also stated to the court that he was disgusted by the ugliness of people and that he was honored to give his life for his cause. The judge conducting the bond hearing ordered that the defendant undergo a behavioral clinical examination at the Psychiatric Institute.

Dr. Satinder Brar, a clinical psychologist and coordinator of the residential treatment unit of Cook County jail, also testified for the defendant. Dr. Brar had diagnosed the defendant with delusional disorder, grandiose type, which is a mental illness. Dr. Brar

determined that the defendant was not willing to cooperate with counsel in his defense because his delusional system was so precious to him that he must protect it.

The defense also called Dr. Paul Fauteck, a forensic psychologist at the Psychiatric Institute. Pursuant to court orders, Dr. Fauteck examined the defendant four times between August 19, 1993, and February 15, 1994, administering psychological tests on two occasions. At the first examination, the defendant seemed very intense, maintaining unbroken eye contact, but was overall appropriately behaved. The defendant described to Dr. Fauteck his philosophy, stating that he was alarmed at the increasing ugliness of the American population and believed that it was due to "false Aryan cosmetics," specifically plastic surgery, hair coloring and tinted contact lenses. The defendant reported that he believed that the Anti-Defamation League was tracking him and had labelled him a "very dangerous man." After the first examination, Dr. Fauteck diagnosed the defendant as suffering from delusional disorder, persecutory type.

During the second examination, Dr. Fauteck administered several psychological tests, the Minnesota Multiphasic Personality Inventory (Second) (MMPI-2), the Rorschach Ink Blot Test and the Thematic Apperception Test, to the defendant. After analyzing the test results, Dr. Fauteck diagnosed the defendant as schizophrenic, paranoid type, which is a mental illness. In reaching this diagnosis, Dr. Fauteck also relied on a social history provided by the defendant's parents, showing a history of apparent schizophrenia in the family, the defendant's statements and behavior, and the defendant's medical records while incarcerated. Dr. Fauteck also noted that the defendant exhibited marked looseness of association, in that he did not have an internal consistency in his delusions, and that he had

reported experiencing auditory hallucinations in 1983 while mildly intoxicated. Dr. Fauteck further testified that it is not uncommon for a psychosis to be intractable and nonresponsive to medications.

In Dr. Fauteck's opinion, the defendant was not fit to stand trial. Dr. Fauteck found that the defendant understood the charges against him, but that his mental illness rendered him incapable of assisting in his defense. Dr. Fauteck explained that, for the defendant, the virtual survival of civilization depends on him and on his sacrificing his life to make a statement. In Dr. Fauteck's opinion, because of his delusion, the defendant could not view the trial process as a defendant should view it and could not make rational decisions about his defense.

On cross-examination, Dr. Fauteck testified that the defendant was very bright and articulate. Dr. Fauteck admitted that, after his first examination of the defendant, his provisional opinion was that the defendant was fit. Dr. Fauteck acknowledged that the criteria in the DSMIII-R for diagnosing schizophrenia are used almost universally in his profession. Dr. Fauteck also acknowledged that, under the DSMIII-R, more than just a delusion is necessary for a diagnosis of schizophrenia. Dr. Fauteck further conceded that a diagnosis of schizophrenia does not by itself render a person unfit for trial.

Dr. Michael Rabin, a forensic psychologist at the Psychiatric Institute, also testified for the defense. Dr. Rabin had particularized training in the scoring of the MMPI and Dr. Fauteck asked him to analyze the defendant's test. Dr. Rabin also sat in on Dr. Fauteck's interviews with the defendant on two occasions. The defendant stated during these interviews that he expects to use the trial as a forum to warn America about the danger posed by fake Aryan cosmetics and that he did not want a lawyer to represent him because his ideas

were so unique that only he could fully explain them. Dr. Rabin diagnosed the defendant as a paranoid schizophrenic. In Dr. Rabin's opinion, the defendant was unable to cooperate with counsel due to his delusional beliefs and was therefore unfit for trial. Dr. Rabin agreed, however, that a diagnosis of schizophrenia does not necessarily mean that a person is unfit.

In addition, psychiatrists Drs. Rafael Carreira and Usha Kartan testified for the defense. While both had diagnosed the defendant as suffering from delusional disorder, neither offered an opinion on the defendant's fitness.

After hearing all of the evidence, the trial court ruled that the defendant had the ability to assist in his defense and was therefore fit to stand trial. This ruling was not against the manifest weight of the evidence. Dr. Markos' testimony provided adequate support for the trial court's finding that the defendant was fit. The only dispute was whether the defendant was capable of assisting in his defense. Dr. Markos, whose qualifications as an expert in this regard were unchallenged, testified that the defendant was capable of assisting in his defense and was therefore fit to stand trial. Dr. Markos' opinion was based on repeated examinations of the defendant and took into consideration all relevant information, including the contrary opinions of his colleagues. While the defendant presented other expert witnesses who testified to a contrary opinion, the trial court was not required to accept the defense experts' view. The credibility and weight to be given to psychiatric testimony are for the trier of fact to determine. *Mahaffey*, 166 Ill. 2d at 18; *People v. Bilyew*, 73 Ill. 2d 294, 302 (1978). As this court has previously stated, "[t]he ultimate issue was for the trial court, not the experts, to decide." *Bilyew*, 73 Ill. 2d at 302.

Moreover, the opinions of the defense experts who

found the defendant unfit were based on the finding that the defendant's beliefs regarding the Aryan race constituted a psychiatric delusion. Dr. Markos disagreed with the finding that the defendant's beliefs were delusional. The trial court was thus called upon to make a credibility determination and decide between the two opposing views expressed by Dr. Markos and by the defense experts. The judge's decision to accept the conclusion of Dr. Markos and reject that of the defense experts was not manifestly in error. The ruling that the defendant was fit to stand trial was therefore not against the manifest weight of the evidence.

### B. Trial Court's Reference to Delusions

In a further attempt to obtain reversal of the fitness finding, the defendant charges that the trial court's ruling cannot be upheld because the trial court made a factual finding which compelled the opposite conclusion. The defendant refers to the following statement by the trial court, made while delivering its ruling on fitness:

> "The fact that an individual has deep-seated, delusional beliefs which are fixed and which do not change in the light of more reasoned beliefs does not lift such feelings to the level of being unable, and I underscore unable, to assist counsel who may not hold or agree with such delusional thought."

The defendant asserts this statement reveals that the trial court found the defendant's beliefs were delusional. The defendant contends all of the expert witnesses testified that, if the defendant's beliefs were delusional, he was not fit to stand trial. Accordingly, the defendant concludes, this factual finding by the trial court required the court to rule that the defendant was unfit.

The defendant's argument fails. When the trial judge's comment is considered in context, it is clear that he had accepted Dr. Markos' testimony that the defendant's belief system did not preclude him from cooperating with counsel. The trial court stated that he found

the defendant fit because, he determined, the defendant was capable of assisting in his defense. The judge's use of the term "delusional" does not render his ultimate conclusion erroneous. Viewed in context, it is apparent that the judge was using the term in a lay or nontechnical sense and was not demonstrating agreement with the opinion of the defense experts. See *People v. Scott*, 148 Ill. 2d 479, 507-08 (1992) (fitness finding upheld despite trial court's comment that the defendant was "unable to cooperate with his own counsel," where it was clear that the court found that the defendant was simply unwilling, not unable, to cooperate and the evidence supported that finding).

### C. Prejudgment of Fitness

The defendant next contends that a comment by the trial judge revealed that he had prejudged the fitness issue. The record does not support this contention.

As discussed earlier in this opinion, prior to the start of the fitness hearing, an issue was raised concerning the defendant's desire to waive a jury for the proceeding. In connection with this issue, the trial court asked the parties for a synopsis of the evidence which would be presented at the fitness hearing. Defense counsel stated that doctors were expected to testify that the defendant was schizophrenic, and argued that this would render the defendant incompetent to waive a jury for fitness. The trial court responded with the following comment:

> "Well I do because I do not think that a paranoid schizophrenic—By nature of that disease, I do not think you are going to find anything that says that they are impaired because of the disease, if they are actively suffering from that disease, in making decisions. Their decisions may be bad, but it does not say anything—."

The defendant contends that these remarks reveal that the trial court had prejudged the issue of the defendant's fitness. We disagree. It is clear from the

context of these remarks that the trial judge was not prejudging fitness, but was simply addressing defense counsel's claim that the defendant was not competent to waive a jury for the fitness hearing.

### D. Reliance on Presumption of Fitness

The defendant finally asserts that the trial court improperly relied on the statutory presumption of fitness in finding the defendant fit. For this contention, the defendant relies on the following comment by the trial court in delivering its ruling:

> "It is, therefore, the finding of this Court that the State has borne its burden by a preponderance of the evidence as to fitness and that the legal presumption of fitness has not been overborne and that the defendant is adjudged to be legally fit to stand trial."

The defendant correctly asserts that, once the trial court finds that a *bona fide* doubt of fitness exists, the presumption of fitness no longer adheres and the burden shifts to the State to prove the defendant's fitness. 725 ILCS 5/104—11(c) (West 1992); *People v. Yonder*, 44 Ill. 2d 376, 383-84 (1969); *People v. Brown*, 252 Ill. App. 3d 377, 383 (1993). The defendant contends the above comment demonstrates that the trial court improperly required the defendant to overcome a presumption of fitness and thereby diluted the State's burden of proof. The defendant's argument is groundless. The trial court's comments as a whole indicate that it properly allocated the burden of proving fitness to the State and did not, as the defendant suggests, require the defendant to overcome a presumption of fitness. The trial court repeatedly stated the correct burden of proof in making its ruling. The incidental reference to the presumption of fitness does not support a finding that the court improperly allocated the burden of proof. See *Yonder*, 44 Ill. 2d at 384 (harmless for trial court to instruct jury both that there was a presumption of

competency and that the State had the burden of proving competency); *People v. Coulter*, 230 Ill. App. 3d 209, 217 (1992).

## Trial

### *Waiver of Counsel*

The defendant asserts that reversal of his convictions is warranted because his waiver of counsel was accepted without compliance with Supreme Court Rule 401(a) (134 Ill. 2d R. 401(a)). We find the defendant's waiver of counsel was valid.

It is well established that the sixth amendment to the United States Constitution guarantees an accused in a criminal proceeding both the right to the assistance of counsel and the correlative right to proceed without counsel. *Faretta v. California*, 422 U.S. 806, 833-34, 45 L. Ed. 2d 562, 580-81, 95 S. Ct. 2525, 2540 (1975); *People v. Lego*, 168 Ill. 2d 561, 564 (1995); *People v. Silagy*, 101 Ill. 2d 147, 179 (1984). The right of self-representation is "as basic and fundamental as [the] right to be represented by counsel." *People v. Nelson*, 47 Ill. 2d 570, 574 (1971). Accordingly, an accused may waive his constitutional right to counsel as long as the waiver is voluntary, knowing and intelligent. *Faretta*, 422 U.S. at 835, 45 L. Ed. 2d at 581, 95 S. Ct. at 2541; *Lego*, 168 Ill. 2d at 564. Although a court may consider the decision unwise, a defendant's knowing and intelligent election to represent himself must be honored out of " 'that respect for the individual which is the lifeblood of the law.' " *Silagy*, 101 Ill. 2d at 180, quoting *Illinois v. Allen*, 397 U.S. 337, 350-51, 25 L. Ed. 2d 353, 363, 90 S. Ct. 1057, 1064 (1970) (Brennan, J., concurring).

Supreme Court Rule 401(a) governs the trial court's acceptance of an accused's waiver of counsel. Pursuant to Rule 401(a), certain admonishments must be given by the trial court before a defendant may be found to have

knowingly and intelligently waived counsel. Rule 401(a) provides as follows:

"(a) Waiver of Counsel. Any waiver of counsel shall be in open court. The court shall not permit a waiver of counsel by a person accused of an offense punishable by imprisonment without first, by addressing the defendant personally in open court, informing him of and determining that he understands the following:

(1) the nature of the charge;

(2) the minimum and maximum sentence prescribed by law, including, when applicable, the penalty to which the defendant may be subjected because of prior convictions or consecutive sentences; and

(3) that he has a right to counsel and, if he is indigent, to have counsel appointed for him by the court." 134 Ill. 2d R. 401(a).

This court has held that compliance with Rule 401(a) is required for an effective waiver of counsel. *People v. Baker*, 94 Ill. 2d 129, 137 (1983). Strict, technical compliance with Rule 401(a), however, is not always required. Rather, substantial compliance will be sufficient to effectuate a valid waiver if the record indicates that the waiver was made knowingly and voluntarily, and the admonishment the defendant received did not prejudice his rights. *People v. Coleman*, 129 Ill. 2d 321, 333 (1989); *People v. Johnson*, 119 Ill. 2d 119, 132 (1987).

In this case, the record reveals that the defendant's waiver of counsel was preceded by substantial compliance with Rule 401(a). The defendant first expressed his desire to "speak on [his] own behalf" at his bond hearing on August 9, 1993. Although it is not entirely clear, the judge presiding over that hearing appears to have allowed the defendant to represent himself for the purposes of that hearing, with an assistant public defender acting in a standby capacity. Subsequently, however, at the defendant's arraignment, the public defender's office entered an appearance on his behalf and acted as his representative at that hearing.

On October 13, 1993, the defendant, still represented by assistant public defenders, appeared before circuit court Judge Locallo. At that time, the defendant indicated that he did not want an attorney to represent him. Judge Locallo responded that before the defendant would be allowed to represent himself, the court would have to be satisfied that he was competent to do so. Accordingly, Judge Locallo stated, he would order the defendant examined for fitness. The defendant, still represented by assistant public defenders, again appeared before Judge Locallo on November 19, 1993. As of that date, a report had been issued by Dr. Mathew Markos stating that the defendant was fit to stand trial. Judge Locallo inquired of the defendant about his desire to represent himself. The defendant stated, "At the moment I will retain my counsel."

On December 14, 1993, the defendant again appeared before Judge Locallo. At that time, Judge Locallo raised the issue of defendant's self-representation. The following colloquy ensued:

"THE COURT: Mr. Haynes, you have appeared before me a number of times. Initially if I recall correctly from one of the first times that you came before me you had indicated that you wished to represent yourself, but then at the same time also have standby counsel.

[DEFENSE COUNSEL]: I am sorry. I didn't realize you were going to address this at this point. If it's your intention, if it's your Honor's intention to address the matter of Mr. Haynes' representation, we're going to interpose an objection at this point.

THE COURT: Before you propose your objection. Obviously you are working hard on this case with co-counsel, and the State is working hard on this case, too, to get ready for trial. The Court is getting mixed signals from Mr. Haynes as to whether he is going to represent himself or whether he is going to have you as counsel. The Court is not going to require Mr. Haynes to make that decision today. But I feel that it is incumbent since this case is in

the system that he should be admonished regarding the consequences of representing himself. *** So I am not going to make Mr. Haynes make his decision, but I feel it is incumbent that he understands the consequences. And he will be given some additional time to make a decision as to what he wishes to do. But I am not going to allow this case to go too much longer because at some point the State has to know who they are going to be dealing with."

Defense counsel objected, asserting that it was inappropriate to address the issue of the defendant's representation before the fitness issue had been resolved. Judge Locallo, however, stated that he believed it was appropriate to admonish the defendant pursuant to Supreme Court Rule 401. The judge proceeded to clarify the defendant's position on the issue:

"THE COURT: All right. Mr. Haynes you had previously stated to me before that you wanted to represent yourself. But then wanted standby counsel. And then on another court date you said you wanted to retain the attorneys that are representing you today. Then on December 6th you had again indicated you wished to represent yourself. Is that a fair assessment of what you had stated before?

THE DEFENDANT: Yes. It's a fair assessment."

Thereafter, Judge Locallo described to the defendant each of the three counts of first degree murder and the one count of burglary with which he was charged. The judge further informed the defendant of the minimum and maximum penalties for first degree murder, including the possibility of an extended term sentence and the death penalty. Judge Locallo informed the defendant that he had the right to be represented by counsel and that, if he could not afford an attorney, one would be appointed for him. The judge also described the functions a lawyer would undertake on the defendant's behalf. The defendant stated that he understood the judge's admonishments. Judge Locallo also inquired into the defendant's personal history, determining that

the defendant was 35 years old, possessed a bachelor's degree in chemistry and had previously appeared in court. Judge Locallo concluded by informing the defendant that, if no further fitness exams were subsequently requested, "then the issue as to who is going to represent you will again be addressed."

Following this court appearance, subsequent fitness examinations were conducted, leading up to a fitness hearing which took place between March 2 and 4, 1994. On March 4, 1994, immediately following the trial court's ruling that the defendant was fit to stand trial, the defendant orally informed the court he would "like to make a move to be my own counsel and be my own representative." The trial judge, Judge Strayhorn, responded as follows:

"THE COURT: You have that right. Mr. Haynes, I will grant that right, but I will order Mr. Sarley and Miss Marchigiani [assistant public defenders] to stand by and offer you such assistance as you ask them to offer in the trial process.

Therefore, defendant's request to represent himself is allowed. Public defender is appointed as standby counsel.

I will set the trial date then.

[DEFENSE COUNSEL]: We would ask for a hearing on whether Mr. Haynes can represent himself.

THE COURT: No. If he wants to represent himself, I have advised him, other judges have advised him against the wisdom of representing oneself in a criminal case. The supreme court says that right cannot be taken away from an individual who wants to do so. Therefore, I am going to let him do so. You will stand by as standby counsel."

Later in this same court appearance, one of the prosecutors sought to obtain from the trial judge clarification of the judge's position on the required admonitions, and the following colloquy ensued:

"[PROSECUTOR]: With respect to Supreme Court Rule 401 regarding the admonishments required, Judge Locallo in our presence did advise the defendant of that.

THE COURT: I know that.

[PROSECUTOR]: I want to make sure that is of record and that is what you are relying on at this point. At that time Judge Locallo—

THE COURT: It was done in open court in the presence of a court reporter. I have no reason to doubt that it wasn't done. I do not feel it necessary to repeat it. It has already been repeated many times to this man. Therefore, if he persists in his determination to represent himself, fine, so be it."

On the first day of trial, April 25, 1994, Judge Strayhorn inquired of the defendant whether he continued in his wish to represent himself and warned him that it was unwise to proceed without counsel. The defendant responded that he wished to represent himself.

On this record, we find that there was substantial compliance with Rule 401(a). After the defendant had repeatedly expressed a desire to represent himself, Judge Locallo admonished the defendant at length regarding his right to counsel and the role defense counsel would play in the proceedings, the nature of the murder and burglary charges against him, and the fact that he could be sentenced to a lengthy term of imprisonment or the death penalty. The defendant stated that he understood each of these admonishments. Judge Locallo also questioned the defendant regarding his personal history to ensure that the defendant was capable of understanding these matters. These efforts by Judge Locallo constituted, at least, substantial compliance with Rule 401(a).

The defendant nonetheless contends that Judge Locallo's admonishments were insufficient to satisfy the requirements of Rule 401(a), for two reasons. First, the defendant argues that the admonishments given by Judge Locallo were ineffective because they were given on December 14, 1993, and the defendant did not actually waive counsel until March 4, 1994. The defendant argues that compliance with Rule 401(a) required that Judge Strayhorn, the judge who accepted the waiver of

counsel, give the defendant the required admonishments at the time he accepted the waiver.

We reject the defendant's contention. Under the specific circumstances of this case, the admonishments given by Judge Locallo were sufficient to comply with Rule 401(a). Judge Locallo's admonishments, though given a number of weeks prior to the defendant's waiver, were given at a time when the defendant had indicated a desire to waive counsel. Moreover, Judge Locallo's comments reveal that he specifically contemplated that the defendant would not make a decision on the waiver issue immediately, but would take time to consider the decision. Judge Locallo stated that he was admonishing the defendant so that the defendant could consider all the pertinent information while he pondered his decision, which would be made at a later date. Thereafter, at the earliest time the issue of the defendant's representation could be revisited (after the defendant's fitness was resolved), the defendant informed the court that he had made the decision to waive counsel. Given these circumstances, we find it reasonable to conclude that the defendant had fully considered the admonishments given by Judge Locallo and was relying on those admonishments when he made his decision to waive counsel.

Further, it is clear that the trial judge, in accepting the defendant's waiver of counsel, was aware that Judge Locallo had admonished the defendant in accordance with Rule 401(a) and relied on those admonishments to conclude that the waiver was knowing and intelligent. The purpose of Rule 401(a) is to ensure that a waiver of counsel is knowingly and intelligently made. *People v. Stahr*, 255 Ill. App. 3d 624, 627 (1994). Judge Strayhorn was aware of the actions of Judge Locallo and thus had a sufficient basis for concluding that the defendant knew and understood his rights and had made a knowing and

intelligent decision to waive counsel. The purpose of Rule 401(a) therefore was not frustrated.

It would have been preferable for the trial judge accepting the waiver to admonish the defendant in accordance with Rule 401(a) at the time he accepted the defendant's waiver of counsel. We cannot hold, however, that the failure of a trial judge to admonish a defendant contemporaneously with his waiver is always fatal to the validity of a waiver of counsel. Rather, each case must be assessed on its own particular facts. In some cases, circumstances may dictate that a lapse in time between the giving of Rule 401(a) admonishments and the defendant's waiver rendered the waiver invalid. See, e.g., *People v. Langley*, 226 Ill. App. 3d 742, 749-50 (1992) (waiver held invalid because only admonishments had been given at the defendant's arraignment seven months earlier, at a time when the defendant was not requesting to waive counsel). Given the circumstances present in this case, we find that the lapse of time between the admonishments and the waiver did not negate the effectiveness of the admonishments.

The defendant also charges that, aside from timing, Judge Locallo's admonishments were insufficient to satisfy Rule 401(a) because Judge Locallo neglected to include the minimum and maximum sentences possible for the burglary charge. We find that this omission did not invalidate the defendant's waiver of counsel. As noted, this court has held that substantial compliance with Rule 401(a) is sufficient where the record shows that the waiver was knowingly and intelligently made. *Coleman*, 129 Ill. 2d at 333; *Johnson*, 119 Ill. 2d at 132. In *Coleman*, the trial court had incorrectly admonished the defendant that the minimum sentence possible if he was convicted of murder was 20 years' imprisonment when, in fact, the minimum sentence possible was natural life imprisonment. This court held that the trial

court had substantially complied with Rule 401(a) in that it had informed the defendant of his right to counsel, described the nature of the charges and explained that the death penalty was a possible sentence. This court concluded that the defendant's waiver of counsel was valid, reasoning that:

> "Where a defendant knows the nature of the charges against him and understands that as a result of those charges he may receive the death penalty, his knowledge and understanding that he may be eligible to receive a lesser sentence pales in comparison." *Coleman*, 129 Ill. 2d at 333-34.

Likewise, in *Johnson,* this court held a waiver of counsel to be valid despite the fact that the trial court had failed to specifically advise the defendant that he faced a mandatory minimum sentence of life imprisonment. This court relied upon the fact that the defendant had been fully apprised that he could receive the death penalty. *Johnson*, 119 Ill. 2d at 132-34.

In this case, as in *Coleman* and *Johnson*, the information omitted from the admonishments did not invalidate the defendant's waiver of counsel. Here, as in those cases, the defendant was fully aware of the range of sentences possible for the most serious charge against him, first degree murder, including the possibility of the death sentence. Given that, the importance of the defendant's having specific knowledge of the minimum and maximum sentences for the significantly less serious charge of burglary clearly "pales in comparison." *Coleman*, 129 Ill. 2d at 334. Accordingly, we hold that Judge Locallo's admonishments, despite the omission of the sentences for burglary, substantially complied with Rule 401(a).

In addition, the record as a whole clearly demonstrates that the defendant's decision to waive counsel was made freely, knowingly and intelligently. The defendant first expressed his desire to represent himself at

the outset of the proceedings against him, and reiterated that desire in open court on several other occasions. Further, several examining doctors at the fitness hearing testified that, during their meetings with the defendant, he was adamant in his desire to represent himself. Consequently, there can be no doubt as to the defendant's choice on the representation issue. In addition, testimony at the fitness hearing revealed that the defendant expressed an understanding of the nature of the charges against him, the role an attorney would play, and the fact that the death penalty was a possible sentence. With regard to his right to appointed counsel, the defendant was repeatedly advised of that right and, in fact, received the assistance of appointed counsel for a period of time prior to trial. It is therefore evident that the defendant understood that he was entitled to legal representation, free of charge if required.

All of these circumstances, combined with the detailed admonishments of Judge Locallo, compel the conclusion that the defendant knew and understood the nature of the charges against him, the sentencing possibilities, and his right to counsel, all of the matters encompassed by Rule 401(a). The defendant's waiver of counsel was valid and reversal of his convictions on this ground is not warranted.

In a related claim, the defendant charges that his waiver of counsel was invalid because his reason for the waiver was irrational, pointing to the testimony at the fitness hearing that the defendant planned to use the trial to broadcast his philosophy. We do not agree that the defendant's waiver may be invalidated on such a basis. We have found that the defendant's waiver was made knowingly and intelligently, and in substantial compliance with the mandates of Rule 401. We decline to require that a trial court, having determined that a defendant's waiver was knowing and intelligent, must

make the further inquiry into whether the defendant has a proper reason for making the waiver. To the contrary, a court must honor a defendant's knowing and intelligent election to proceed *pro se*, even if the court considers the decision unwise. *Silagy*, 101 Ill. 2d at 179-80.

Alternatively, the defendant claims that the trial court erred in failing to readmonish him regarding his waiver of counsel prior to the sentencing hearing. This court has held that, in the absence of circumstances indicating that the waiver is limited, a valid pretrial waiver of counsel by a defendant who is advised that he has the right to counsel at all stages of the proceedings is operative at sentencing. *People v. Johnson*, 119 Ill. 2d 119, 145-47 (1987); *People v. Baker*, 92 Ill. 2d 85, 95 (1982). We find no indication in the record that the defendant's pretrial waiver of counsel was limited to trial only. Further, we note that, prior to the sentencing hearing, the trial court inquired of the defendant whether he persisted in his desire to represent himself and advised him against proceeding *pro se*. The defendant informed the trial court that he wished to continue representing himself. Readmonishment of the defendant prior to sentencing was not required.

### Other-Crimes Evidence

The defendant also charges that he was denied a fair trial by the introduction of irrelevant and inflammatory evidence of other crimes he committed. During trial, the State introduced evidence demonstrating that the defendant had attempted to murder Charles Stroupe and had murdered Frank Ringi. The defendant contends that this evidence was irrelevant and its introduction requires a new trial. We find no grounds for reversal. .

The defendant raised no objection to the admission of any of the challenged evidence. Consequently, the defendant waived any error in the admission of this evi-

dence. *People v. Enoch*, 122 Ill. 2d 176, 186 (1988). Moreover, even if error occurred in the introduction of this evidence, we would be compelled to find that the error was harmless beyond a reasonable doubt. See *People v. Williams*, 164 Ill. 2d 1, 24 (1994). The properly admitted evidence demonstrating the defendant's guilt of the murder of Dr. Sullivan was nothing short of overwhelming. Not only did the defendant confess to the murder to police, the defendant also repeatedly confessed to the murder in open court during the trial. In addition, several eyewitnesses identified the defendant as the perpetrator of this crime, and the murder weapon and other incriminating evidence were found in the defendant's apartment. Under these circumstances, any error in the admission of the complained-of evidence was harmless.

For the foregoing reasons, we reject the defendant's claims that he is entitled to a new trial. The defendant has raised the point, and the State agrees, that it was error for the trial court to enter judgment on three counts of murder, where there was only one victim. Accordingly, the conviction for felony murder and the conviction for knowing murder are vacated. *People v. Pitsonbarger*, 142 Ill. 2d 353, 377 (1990) (when multiple murder convictions have been entered for the same act, the less culpable convictions must be vacated). The defendant's convictions for intentional murder and burglary are affirmed.

## Sentencing

### Eligibility Determination

The defendant's first claim of error with regard to sentencing is directed at the trial court's finding that he was eligible for the death penalty. As noted, the defendant was found eligible based on two statutory eligibility factors: (1) that the defendant intentionally killed

Dr. Sullivan in the course of committing a burglary (720 ILCS 5/9—1(b)(6) (West 1992)), and (2) that the defendant committed the murder in a cold, calculated and premeditated manner pursuant to a preconceived plan (720 ILCS 5/9—1(b)(11) (West 1992)).

The defendant does not challenge the sufficiency of the evidence to support a finding of death eligibility. Rather, the defendant contends that the eligibility finding must be reversed because it was made summarily by the trial court without a hearing on the issue. The record supports the defendant's factual assertions in this regard. According to the record, immediately after the trial court issued its guilty verdict at trial, the court went on to find the defendant eligible for the death penalty without hearing any additional evidence or argument. Later in the proceeding, the State informed the court that it was prepared to proceed with the eligibility hearing and the trial judge responded that he would not hold such a hearing because he had already found the defendant eligible. The State subsequently requested that the trial court inquire of the defendant whether he wished to present any evidence on eligibility. The trial court refused, stating:

"THE COURT: No. Doesn't need to be. I found as a matter of law that he is eligible. So, whatever he says is not going to have any consequence because the law says he's eligible."

After reviewing these comments and others made by the trial court, we conclude that the trial court did, as the defendant here claims, dispense with a hearing on eligibility and make a summary finding of eligibility. This conduct by the trial court was clearly in violation of our death penalty statute. The death penalty statute expressly requires that a separate sentencing hearing be conducted for the dual purposes of "determin[ing] the existence of factors set forth in subsection (b) [eligibility factors]" and "consider[ing] any aggravating or mitigat-

ing factors." 720 ILCS 5/9—1(d) (West 1992); *People v. Brown*, 169 Ill. 2d 132, 155-56 (1996). The statute provides that, at the sentencing hearing, "any information relevant to any of the factors set forth in subsection (b) [eligibility factors] may be presented by either the State or the defendant under the rules governing the admission of evidence at criminal trials," and "[t]he State and the defendant shall be given fair opportunity to rebut any information received at the hearing." 720 ILCS 5/9—1(e) (West 1992). The trial court thus clearly erred in making the eligibility determination without providing the defendant the opportunity, at a separate sentencing hearing, to offer evidence on the issue and rebut that of the State.

Our review of the record further reveals, however, that at no time prior to or during the sentencing proceedings did the defendant demand a hearing on eligibility, request that he be permitted to present evidence on the issue, or otherwise object to the trial court's handling of the issue. Thus, we are compelled to find that the defendant acquiesced in the summary procedure employed by the trial court, and thereby waived this claim of error for review. *People v. Enoch*, 122 Ill. 2d 176, 186 (1988). The fact that the defendant was proceeding *pro se* does not excuse his failure to preserve an error for review. *People v. Long*, 39 Ill. 2d 40, 43 (1968). This is particularly true here, where the defendant was provided with standby counsel who were available to assist him. *Long*, 39 Ill. 2d at 43. Moreover, the defendant has not demonstrated that he was prejudiced by the trial court's actions. As discussed later in this opinion, the evidence supporting the defendant's eligibility, at least under the factor set forth in section 9—1(b)(11) of the Criminal Code of 1961 (720 ILCS 5/9—1(b)(11) (West 1992)), was nothing short of overwhelming. Moreover, the circumstances of this case are unique,

in terms of the potential for prejudice to the defendant. We cannot view this error in a vacuum; rather, we must look at the record as a whole to determine if reversal is required. The defendant represented himself throughout the trial and sentencing proceedings. In the course of that representation, the defendant chose to present no evidence to challenge either his guilt or the death penalty, save for his own inflammatory comments in which he admitted his guilt and espoused his racist philosophy. The evidence at trial, in particular the defendant's own detailed confessions, overwhelmingly established the defendant's guilt of the charged crimes, and also overwhelmingly established his eligibility for the death penalty. The same judge who acted as the fact finder at the defendant's trial took into account all of this evidence and found that the defendant was eligible for the death penalty. A hearing on aggravation and mitigation was held, at which hearing the defendant had every opportunity to present evidence or argument in opposition to a death sentence. The defendant presented no evidence other than his own brief statement in which he again condemned fake Aryan cosmetics. After the aggravation-mitigation hearing, the trial judge reiterated the eligibility finding in his sentencing order. In addition, as noted above, the defendant made no objection to the manner in which the eligibility finding was made. The dissent speculates that the defendant's failure to object should be excused because objection would have been futile. If speculation is to be considered, however, it may also be speculated that the defendant's lack of objection was simply consistent with his strategy throughout the proceedings. The defendant does not now suggest what argument or evidence could have been presented in opposition to eligibility. Thus, we find no circumstances which require reversal of the defendant's sentence in this case, particularly in light of the

defendant's waiver. We note that this court recently held that reversal of a defendant's death sentence was not warranted where defense counsel failed to mount any challenge to the defendant's eligibility, because the evidence supporting the defendant's eligibility was overwhelming. *People v. Shatner*, 174 Ill. 2d 133 (1996).

We emphasize, however, that we do not condone the procedure employed here of summarily deciding a defendant's eligibility for the death penalty. The evidence presented at a defendant's culpability trial is properly considered in making the eligibility determination. However, a trial court may not simply combine the eligibility determination with the culpability trial. Not only does the statute provide otherwise, fairness militates against such a procedure. The issues to be decided at the culpability trial differ from those to be decided for death eligibility. Not all those convicted of murder may be found eligible for the death penalty, and the requirement of a statutory eligibility factor fulfills the constitutional requirement of " 'narrow[ing] the class of persons eligible for the death penalty and *** reasonably justify[ing] the imposition of a more severe sentence on the defendant compared to others found guilty of murder.' " *People v. Hope*, 168 Ill. 2d 1, 36 (1995), quoting *Zant v. Stephens*, 462 U.S. 862, 877, 77 L. Ed. 2d 235, 249-50, 103 S. Ct. 2733, 2742 (1983). The culpability trial focuses only on whether the defendant is guilty of murder, not on the further consideration of whether he is also eligible for the death penalty. Under this scheme, a defendant cannot be expected to defend against both a guilty verdict and a finding of eligibility at the culpability trial.

The dissent strenuously urges that reversal of the defendant's sentence is warranted on this ground. The basis for the dissent's belief that this error requires reversal in this case is less than clear. The bulk of the

dissent's argument sets forth reasons why the trial court's actions were in error. As we have stated, we are in agreement with the dissent that the requirements of the death penalty statute were violated when the trial court summarily determined eligibility. We, along with the dissent, strongly condemn the trial court's actions in failing to adhere to the mandated statutory procedures. The dissent would hold that reversal of the defendant's sentence is required as a result of this error. Notably lacking in the dissent, however, is any explanation of how, *given the unique circumstances in this case*, the defendant was prejudiced by the trial court's actions. Our holding here is predicated on the unique facts of this case, and we do not suggest that the procedure employed would not result in reversal in another case.

Parenthetically, we are compelled to point out that the dissent, in discussing *People v. Brown*, 169 Ill. 2d 132 (1996), misstates the holding of that case. The dissent states that in *Brown*, this court reversed a death sentence on the ground that the trial court committed error in immediately proceeding to determine eligibility after finding the defendant guilty. *Brown*, however, did not even address the propriety of the trial judge's actions in this regard, let alone order reversal on that ground. Rather, reversal of the defendant's death sentence in *Brown* was predicated wholly on the fact that the defendant's pretrial waiver of a jury for death sentencing was invalid because the trial judge, in obtaining the waiver, misinformed the defendant that he must waive a jury for sentencing as a precondition to waiving a jury for trial. *Brown*, 169 Ill. 2d at 154-161. No similar facts are present here, and the dissent's suggestion that *Brown* compels reversal in this case is not accurate.

In a related contention, the defendant argues that reversal is required because the trial court's summary

finding of eligibility indicated that the trial court was predisposed to impose the death penalty. We fail to see, however, how a determination of eligibility, which must be made in every case before the death penalty may be imposed, indicates a "predisposition" to impose a death sentence.

*Jury Waiver at Sentencing*

The defendant waived a jury for his capital sentencing hearing. The defendant now claims that his waiver was not knowing and intelligent because the trial court failed to inform him that the vote of one juror could preclude a sentence of death. This claim is without merit. We have repeatedly held that a valid capital sentencing jury waiver does not require the trial court to admonish the defendant that the vote of a single juror is sufficient to preclude imposition of the death penalty. *People v. Todd*, 154 Ill. 2d 57, 72 (1992); *People v. Erickson*, 117 Ill. 2d 271, 295 (1987). This court has held it is sufficient, for a valid capital sentencing jury waiver, for the trial court to explain to the defendant that he is waiving the right to have a jury consider the capital sentencing issues and that the sentencing decision would, therefore, be made by the judge alone. *People v. Brown*, 169 Ill. 2d 132, 156 (1996); *People v. Wiley*, 165 Ill. 2d 259, 301 (1995). The record reveals that the trial court's admonishments to the defendant prior to accepting the sentencing jury waiver met these requirements. The defendant's contention that his sentencing jury waiver was invalid is therefore rejected.

The defendant also suggests that his jury waiver was invalid because he was not specifically told by the trial court that he had the right to a jury for the eligibility determination. As noted above, however, we have found that the trial court's admonishments to the defendant were sufficient to effectuate a valid sentencing jury waiver. Further, our review of the record reveals that

the defendant clearly waived a jury for the entire sentencing determination.

### Reevaluation of Fitness Prior to Sentencing

The defendant next claims that reversal of his death sentence is warranted because the trial court erred in rejecting standby counsel's request for a reevaluation of the defendant's fitness prior to sentencing. Shortly after the trial court issued its verdict finding the defendant guilty, standby counsel for the defendant asked the court to order the defendant examined for fitness for sentencing. The trial court refused this request, stating that the defendant had already been found fit.

On appeal, the defendant acknowledges that he was found fit to stand trial after a lengthy pretrial hearing. The defendant does not claim that, subsequent to that hearing, a *bona fide* doubt of his fitness was raised such that the trial court was required to hold a fitness hearing prior to sentencing. 725 ILCS 5/104—11(a) (West 1992). Rather, the defendant contends only that the trial court should have ordered him examined for fitness at that time. We disagree.

The decision whether to order a fitness examination is expressly left to the discretion of the trial court because it is in a superior position to observe and evaluate the defendant's conduct. 725 ILCS 5/104—11(b) (West 1992); *People v. Hall*, 186 Ill. App. 3d 123, 131-32 (1989). In this case, we find no abuse of discretion in the trial court's denial of standby counsel's request for appointment of an expert. The defendant had already been extensively examined for fitness by several experts and the findings of those experts were fully presented at the pretrial fitness hearing. After hearing that testimony, the trial court ruled that the defendant was fit, and we have found that this ruling was supported by the evidence. In denying the request for reevaluation, the trial court stated that it had observed nothing during the

course of the trial which indicated that the defendant's status with regard to fitness had changed. The only new matter pointed to by standby counsel as justification for ordering a new fitness examination was the defendant's behavior of "rocking back and forth" during the trial. This matter, however, was brought to the attention of the trial judge, who indicated that he had noticed the behavior, but that he did not find that it required a new fitness examination. The trial judge was in the best position to make this determination, having personally observed the defendant over the course of these proceedings. We cannot find that the trial court's denial of the request for reevaluation was an abuse of discretion. See *Hall*, 186 Ill. App. 3d at 133-34; *People v. Banks*, 94 Ill. App. 3d 122, 129 (1981).

The defendant also makes the vague assertion that a new fitness examination was required because the trial court "knew" that the defendant was receiving antipsychotic medications. This assertion is groundless. The trial court's knowledge that the defendant was receiving such medications was gained from the testimony presented *at the defendant's fitness hearing.* Thus, the trial court certainly took this information into account in making the pretrial fitness determination. There is no evidence that the administration of antipsychotic drugs to the defendant was changed in any manner that would have required a revisitation to the issue of his fitness prior to sentencing.

### Constitutionality of Section 9—1(b)(11)

The defendant asserts that his death sentence must be vacated because he was found eligible on the basis of an unconstitutionally vague eligibility factor. As noted, the defendant was found eligible for death on the basis of two eligibility factors: (1) murder in the course of a felony (720 ILCS 5/9—1(b)(6) (West 1992)), and (2) murder committed in a cold, calculated and premeditated

manner pursuant to a preconceived plan (720 ILCS 5/9—1(b)(11) (West 1992)). The defendant challenges the constitutionality of section 9—1(b)(11), arguing that its terms do not adequately narrow the class of those eligible for death. The defendant's challenge fails.

Section 9—1(b)(11) provides that a statutory eligibility factor exists if:

> "the murder was committed in a cold, calculated and premeditated manner pursuant to a preconceived plan, scheme or design to take a human life by unlawful means, and the conduct of the defendant created a reasonable expectation that the death of a human being would result therefrom." 720 ILCS 5/9—1(b)(11) (West 1992).

This court has already held that section 9—1(b)(11) is not unconstitutionally vague, finding that its terms place the necessary restraint on the sentencer's discretion to impose death. *People v. Munson*, 171 Ill. 2d 158, 191-92 (1996); *People v. Johnson*, 154 Ill. 2d 356, 372-73 (1993).

In this case, the evidence overwhelmingly supported a finding of eligibility based on section 9—1(b)(11). The evidence showed that the defendant coldly and meticulously planned the murder of Dr. Sullivan. Some time prior to the crime, the defendant decided to commit the murder of a plastic surgeon in order to "strike out" against the perpetrators of "fake Aryan cosmetics." In furtherance of this goal, the defendant perused the yellow pages of the telephone book and selected Dr. Sullivan as his target, based on the size of his advertisement. A few days prior to the crime, the defendant called Dr. Sullivan's office and made an appointment under a false name. At the scheduled date and time, the defendant went to Dr. Sullivan's office for the purpose of carrying out his plan. The defendant waited to commit the murder until he was in the office with Dr. Sullivan so that he could be sure that he was murdering the right man. In addition, the defendant stated that he had planned

an escape route and that he had carefully parked his car to best effect his escape after the murder. A more coldly planned murder is difficult to imagine. Thus, the evidence clearly established the existence of this eligibility factor.

### Existence of Statutory Mitigating Factor

The defendant also contends that reversal of his death sentence is warranted because the trial court effectively ignored the existence of a statutory mitigating factor. The defendant claims the evidence showed that, at the time of the murder, he was acting under the influence of extreme mental or emotional disturbance within the meaning of section 9—1(c)(2) of the death penalty statute. 720 ILCS 5/9—1(c)(2) (West 1992). This contention is not supported by the record. The only expert witness to give an opinion at sentencing with regard to the existence of this mitigating factor at the time of the murder was Dr. Markos. Dr. Markos testified that, in his opinion, the defendant was not operating under the influence of extreme mental or emotional disturbance at the time of the murder.

The defendant also claims that brief questioning of Dr. Markos by the trial court, designed to ascertain if the doctor considered the defendant to be mentally ill, demonstrates that the trial court applied an erroneous interpretation of the statutory factor. This conclusion is not supported. The trial court expressly stated that it had considered the mitigating factors set forth in the death penalty statute. We find no indication in the record that the trial court failed to properly evaluate these factors. The questioning referred to by the defendant constituted nothing more than the trial court's effort to clarify a portion of Dr. Markos' testimony, which he found confusing. We find no abuse of discretion in the trial court's determination that this statutory mitigating factor was not present.

*Constitutionality of Death Penalty Statute*

Finally, the defendant raises two constitutional challenges to the Illinois death penalty statute. The defendant first contends that the statute is unconstitutional because it places a burden of proof on the defendant which precludes meaningful consideration of mitigating evidence. This court has previously rejected this argument (see *People v. Edgeston*, 157 Ill. 2d 201, 247 (1993)), and we decline to reconsider that holding. The defendant also contends that the death penalty statute is unconstitutional because it does not sufficiently minimize the risk of arbitrarily or capriciously imposed death sentences. We decline to reconsider our previous holding rejecting this constitutional challenge. See *People v. Tenner*, 157 Ill. 2d 341, 390 (1993).

## CONCLUSION

For the reasons set forth above, we affirm the defendant's convictions for intentional murder and burglary and affirm his death sentence. We vacate, however, the defendant's convictions for knowing and felony murder. We hereby direct the clerk of this court to enter an order setting Wednesday, January 15, 1997, as the date on which the sentence of death entered by the circuit court of Cook County shall be carried out. The defendant shall be executed in the manner provided by law. 725 ILCS 5/119—5 (West 1994). The clerk of this court shall send a certified copy of the mandate in this case to the Director of Corrections, the warden of Stateville Correctional Center, and the warden of the institution where the defendant is now confined.

*Convictions affirmed in part
and vacated in part;
sentences affirmed.*

JUSTICE FREEMAN, concurring in part and dissenting in part:

Although I concur in the majority's affirmance of the defendant's burglary and intentional murder convictions in this case, I disagree with its conclusions concerning the propriety of the death sentence hearing. Specifically, I am deeply troubled by the majority's treatment of the trial judge's summary finding that defendant was eligible for the death penalty. The trial judge here not only failed to follow the procedure established by the legislature in conducting the hearing, but also misstated the law to a *pro se* defendant. These errors, taken together, cast serious doubt on the integrity of the proceeding which we review today. Therefore, I must respectfully dissent from that portion of the opinion.

I

Our death penalty statute expressly provides that upon the *State's* request, the court "shall conduct a separate sentencing proceeding to determine the existence of factors set forth in subsection (b) [eligibility factors] and to consider any aggravating or mitigating factors as indicated in subsection (c). The proceeding shall be conducted *** before the court alone if the defendant waives a jury for the separate proceeding." 720 ILCS 5/9—1(d)(3) (West 1992). During the hearing, "any information relevant to any of the [eligibility] factors *** may be presented by either the State or the defendant under the rules governing the admission of evidence at criminal trials. *** The State and the defendant shall be given fair opportunity to rebut any information received at the hearing." 720 ILCS 5/9—1(e) (West 1992). Finally, the statute further provides that the burden of proof for establishing the existence of the eligibility factors is on the State and "shall not be satisfied unless established beyond a reasonable doubt." 720 ILCS 5/9—1(f) (West 1992).

The transcript of proceedings in this case reveals

that the trial judge did not follow these procedures. I quote from the record at length in order to relate in full the extent to which the judge deviated from the statute. As demonstrated by the portion of the transcript quoted below, the eligibility hearing took place immediately after the trial court found defendant guilty as charged in the indictment.

"[THE COURT]: There's really nothing that the court can add to what has already been added by virtue of the totality of the evidence in this case and so, therefore, it now becomes my obligation and responsibility to tell Mr. Jonathan Haynes that he is guilty in the manner and form as charged in the indictment. That is the finding of the court, and judgment will be entered on the finding.

Please step up, Mr. Haynes. Mr. Haynes, under the charge that has been placed against you, this is felony murder. A felony murder carries with it a possible sentence of death. And *since the court has found you guilty in manner and form as charged in the indictment, and since one of the allegations in the indictment was that you committed this first degree murder in the course of the perpetration of another felony, that being burglary, that makes you eligible to have death imposed upon you as a sentence in this case.*

The law states that under these circumstances, a Defendant having been found guilty under the felony murder count of the indictment has a right to have the determination made as to whether or not death should be imposed by a fact finder, either a jury or by the court. And I now ask you at this time, do you understand what I have just stated?

MR. HAYNES: Yes, I do.

THE COURT: Do you wish to confer again with [standby counsel] with reference to your rights now as to whether you wish to have a jury hear and make a determination as to what the sentence should be in this case or whether you wish the court to make that determination? Do you wish to—confer with [stand-by] counsel on that issue?

MR. HAYNES: No, I do not.

THE COURT: What is your desire? Do you wish a jury

to hear and make a determination as to the sentence to impose upon you after you have been found guilty of first degree felony murder or do you wish to [*sic*] court to make that determination?

MR. HAYNES: I will let the court decide.

THE COURT: I will ask you at this time, therefore, to sign the jury waiver which states that you waive your constitutional right to have a jury determine what your punishment should be in this case, and are willing to submit this issue to a court sitting without a jury.

* * *

Mr. Haynes, I'm passing to you a document which if you sign it means that you will waive your constitutional right to have a jury hear evidence and determine what the sentence should be in this case after a finding of guilty. I want you to be absolutely clear that you understand what you are signing when you sign this document. Do you understand that?

MR. HAYNES: Yes. Yes, I do." (Emphasis added.)

At this point in the proceedings, stand-by counsel requested to have defendant ordered examined for a determination of his fitness to be sentenced. The court denied the request. The following colloquy then occurred:

"MR. PAYNTER [Assistant State's Attorney]: Your Honor, the People at this time would just merely wish to supplement the action the court has taken by filing with the court *a motion to conduct a sentence proceeding to determine the imposition of the death penalty.*

THE COURT: Proceed.

MR. PAYNTER: We are prepared to proceed on the eligibility.

THE COURT: No, I find him eligible. *So we don't have to have any evidence presented on that issue. I find that the law is such that he is charged with felony murder. He has been found guilty of felony murder.*

With felony murder, one of the sentences that is possible for a felony murder is the death penalty. So I find him based upon the evidence that has been presented in the trial, that he is eligible to have the death penalty imposed upon him.

MR. PAYNTER: The court also takes judicial notice the Defendant is over the age of 18.

THE COURT: Yes." (Emphasis added.)

The court then continued the proceeding to the following week, stating that "[t]here's been a finding of eligibility for the imposition of the death penalty."

At the beginning of the next court session, the trial judge stated to defendant that "this is the sentence hearing. The State is asking that you be sentenced to death, and *under the statute, there is a sentencing hearing required because the Court has found that you are eligible to have the death penalty imposed.* Do you still desire and wish to represent yourself in this sentencing hearing?" (Emphasis added.) Defendant responded affirmatively. The following exchange between the assistant State's Attorney and the trial judge then occurred:

"MR. NELSON: Judge, we addressed the eligibility question on Friday.

We'd ask you to inquire of the defendant if there was any evidence he wished to offer on that particular issue.

THE COURT: No. *Doesn't need to be. I found as a matter of law that he is eligible. So, whatever he says is not going to have any consequence because the law says he's eligible.*" (Emphasis added.)

## II

The majority concludes that the "trial court did, as the defendant here claims, dispense with a hearing on eligibility and make a summary finding of eligibility. This conduct by the trial court was clearly in violation of our death penalty statute." 174 Ill. 2d at 247. The majority, however, goes on to hold that "at no time *** did the defendant demand a hearing on eligibility, request that he be permitted to present evidence on the issue, or otherwise object to the trial court's handling of the issue *** and thereby waived this claim of error for review." 174 Ill. 2d at 248. I find this resolution of defendant's contentions, on the basis of waiver, disconcerting on two levels.

Initially, I cannot fathom how a *pro se* defendant, having just been found guilty of murder, can be expected to perceive and appreciate the ramifications of the trial judge's errors with regard to sentencing procedure when, with all respect, the learned trial judge did not. Even if defendant had, the record indicates that the judge would not have been receptive to a challenge. As revealed in the transcript quoted above, the trial judge refused even the prosecutor's attempts to tailor the hearing to conform with the requirements of the statute. There is no reason to believe that this *pro se* defendant's exhortations would have fared any better. Although I generally agree that a *pro se* defendant must be held to the same standards as an attorney, the United States Supreme Court has recognized that the judge before whom a defendant appears without counsel has a duty "to take all steps necessary to insure the fullest protection" of the constitutional right to a fair trial "at every stage of the proceedings." *Von Moltke v. Gillies*, 332 U.S. 708, 722, 92 L. Ed. 309, 320, 68 S. Ct. 316, 322 (1948). This protection extends both to the right to counsel and to all "essential rights of the accused." *Glasser v. United States*, 315 U.S. 60, 71, 86 L. Ed. 680, 699, 62 S. Ct. 457, 465 (1942). The transcript in this case demonstrates that the trial judge was less than meticulous in safeguarding defendant's rights at sentencing.

Under my reading of our death penalty statute, a defendant is not under any obligation to "demand" a hearing on eligibility. The statute mandates that the trial court "shall" conduct such a hearing upon the State's request. See 720 ILCS 5/9—1(d) (West 1992). The transcript amply illustrates that any objection or request for permission to adduce evidence regarding eligibility on defendant's part would have been futile: The prosecutor, sensing the gravity of the judge's actions, specifically requested the judge to inquire of de-

fendant if there was any evidence he wished to offer as to eligibility. The trial judge refused, stating that there "[d]oesn't need to be" because he had already "found that as a matter of law that [defendant was] eligible." The statute, however, expressly provides that a defendant may present any information relevant to factors regarding eligibility. See 720 ILCS 5/9—1(e) (West 1992). Thus, the majority's stated reasons for finding waiver ring hollow when juxtaposed against what was actually said and done at the hearing.

It is with these concerns in mind, perhaps, that the majority ultimately concludes that defendant "has not demonstrated that he was prejudiced by the trial court's actions." 174 Ill. 2d at 248.[1] The reason the majority gives for this conclusion is that the evidence of defendant's eligibility was "overwhelming." 174 Ill. 2d at 248. That may be so, but the harm caused by the trial judge's error affected more than mere eligibility. Contrary to the majority's position, I believe that the trial court's determination of defendant's death eligibility, made *before* the State even filed its motion for a death sentencing hearing, resulted in two distinct problems which mandate reversal.

First, the trial judge preempted the State from going forth with *its* case of death eligibility. Indeed, when the prosecutor attempted to adduce its evidence of eligibility, the trial judge replied, erroneously, that we "don't have to have any evidence presented on that issue. He has been found guilty of felony murder." Not only does this statement presuppose that the State

---

[1] It is unclear whether the "prejudice" to which the majority refers relates to our plain error exception to the waiver doctrine (134 Ill. 2d R. 615(a)) or whether it relates to an examination of defendant's claim on the merits. I would invoke the second prong of the plain error exception in this case (error whose commission denies defendant a fair and impartial trial) and excuse the waiver. See *People v. Carlson*, 79 Ill. 2d 564, 576-77 (1980).

wished to proceed on a felony-murder theory of death eligibility, but it evinces the trial judge's disregard of defendant's statutory right both to put on evidence and to rebut the information adduced by the State at the eligibility phase of the hearing. In upholding the constitutionality of our death penalty statute, the Seventh Circuit Court of Appeals noted that the statute's "series of procedural safeguards ensure that the defendant is given a meaningful opportunity to respond to the State's request for the imposition of the death penalty." *Silagy v. Peters*, 905 F.2d 986, 997 (7th Cir. 1990). As a result, that court determined that the sentencing hearing mandated by our statute provides for all the procedure which is due under the fourteenth amendment. *Silagy v. Peters*, 905 F.2d at 998. Thus, when a trial judge dispenses with the eligibility hearing, one of the series' procedural safeguards of due process is lost.

More important, the trial judge's statement demonstrates a disregard of the fact that not all defendants found guilty of felony murder at trial are *ipso facto* death eligible at sentencing. A capital sentencing scheme must provide a " 'meaningful basis for distinguishing the few cases in which [the penalty] is imposed from the many cases in which it is not.' " *Gregg v. Georgia*, 428 U.S. 153, 188, 49 L. Ed. 2d 859, 883, 96 S. Ct. 2909, 2932 (1976), quoting *Furman v. Georgia*, 408 U.S. 238, 313, 33 L. Ed. 2d 346, 392, 92 S. Ct. 2726, 2764 (1972) (White, J., concurring). The United States Supreme Court has recognized that the eligibility phase of a death sentence hearing plays a "constitutionally necessary" function by "circumscrib[ing] the class of persons eligible for the death penalty." *Zant v. Stephens*, 462 U.S. 862, 877-78, 77 L. Ed. 2d 235, 251, 103 S. Ct. 2733, 2743 (1983). This phase of the hearing safeguards against arbitrary and capricious sentencing because it

reasonably justifies the narrowing of the class of persons convicted of murder who are eligible for the death penalty. *Zant*, 462 U.S. at 874-77, 77 L. Ed. 2d at 248-49, 103 S. Ct. at 2741-42. In the past, this court, too, has echoed these same concerns by noting that "[a]ggravating factors serve as necessary prerequisites without which the death sentence cannot be imposed; they delineate the borderline between those cases in which death is a possible punishment and those in which it cannot be considered." *People v. Lewis*, 88 Ill. 2d 129, 145 (1981); see also *People v. Ramey*, 151 Ill. 2d 498, 544 (1992); *People v. Simms*, 143 Ill. 2d 154, 170 (1991). Thus, the trial judge's error unnecessarily compromised the constitutionality of the hearing conducted in this case.

### III

Despite the trial judge's failure to adhere to the statute's procedural requirements and his numerous misstatements of the law throughout these proceedings, the majority holds that the trial court's admonishments to the defendant "were sufficient to effectuate a valid sentencing jury waiver." 174 Ill. 2d at 252. I strongly disagree.

After the trial judge had found, *sua sponte*, defendant eligible for the death penalty, he undertook to ascertain if the defendant wished to waive a jury for his hearing. As noted, our death penalty statute grants defendants the right to choose a jury for their death sentencing hearing even when they are convicted at a bench trial. See 720 ILCS 5/9—1(d) (West 1992). The statute thus contemplates a hearing in which a jury will consider defendant's eligibility for the death penalty *in addition to* whether the death penalty should be imposed. Thus, defendant possesses a liberty interest, protected by the due process clause of the fourteenth amendment, to have, if he so desires, a jury decide *all* of the issues relevant to sentencing. See *People v. Mack*,

167 Ill. 2d 525, 534 (1995). Here, however, the trial judge effectively denied defendant his right to elect to have a jury determine eligibility. Therefore, I cannot join in the majority's terse conclusion that the "record reveals that the defendant clearly waived a jury for the *entire* sentencing determination." (Emphasis added.) 174 Ill. 2d at 252-53. Although defendant may have knowingly given up his right to have a jury elect his fate *in the manner erroneously described to him by the trial judge*, it cannot be said that he knowingly waived a statutory right which, unbeknownst to him, had already been denied.

### IV

Accordingly, I cannot agree with my colleagues that because there is evidence in the record to support a finding of eligibility, defendant suffered no prejudice from the trial judge's actions. In the past, this court has required "a high standard of procedural accuracy" in death sentencing hearings in order to ensure that "*the penalty is applied in as uniform a manner as possible within the framework of an adversary proceeding.*" (Emphasis added.) *People v. Walker*, 91 Ill. 2d 502, 517 (1982). In fact, this court recently, in a unanimous decision, reversed a sentence of death imposed by the same trial judge for actions similar, in part, to those reviewed here today. See *People v. Brown*, 169 Ill. 2d 132, 163 (1996) (finding error where trial judge immediately proceeded to determine death eligibility after finding defendant guilty of murder). Given the similarity of the complained-of actions in the case at bar, I see no reason for today's departure from such recent precedent.

Where, as here, the trial judge takes it upon himself to declare a defendant death eligible immediately after finding that defendant guilty and prior to the State's formal request for a death sentencing hearing, the resultant "hearing" loses the appearance of an adver-

sarial proceeding. The manner in which the trial judge rushed to make the eligibility judgment was not only statutorily infirm, but unseemly. His statements regarding the felony-murder eligibility factor reflect an erroneous belief that all defendants convicted of felony murder are eligible for death as a matter of law and no evidence need be heard on the issue. Such a viewpoint certainly does not inspire confidence in the judge's ability to hear the issue impartially. Although the majority "emphasize[s]" that it "do[es] not condone" the procedure employed by the trial judge (174 Ill. 2d at 250), its ultimate affirmance of the death sentence, in my mind, provides little, if any, incentive against its future commission. As the cases analyzing the constitutionality of our death penalty clearly demonstrate, the procedure established by the General Assembly for conducting a death sentencing hearing is not a mere suggestion to be complied with on an *ad hoc* basis. In matters of life and death, it is this court's constitutional, if not moral, obligation to do more than "not condone" the improper actions of the trial judge in this case. We must not hesitate to reverse those actions lest bench and bar assume that the laxity at issue here is, in any way, tolerable or excusable. It simply is not. Therefore, I would vacate defendant's death sentence and remand the matter for a new sentencing hearing which comports with the procedural requirements of the statute.

JUSTICES MILLER and McMORROW join in this partial concurrence and partial dissent.