2021 IL App (1st) 191382-U

No. 1-19-1382

Order filed August 6, 2021

Fifth Division

**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

IN THE

APPELLATE COURT OF ILLINOIS

FIRST DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Cook County. |
| | ) | |
| v. | ) | No. 17 CR 13102 |
| | ) | |
| KELBY SMITH, | ) | Honorable |
| | ) | Timothy J. Joyce, |
| Defendant-Appellant. | ) | Judge, presiding. |

JUSTICE HOFFMAN delivered the judgment of the court.
Presiding Justice Delort and Justice Cunningham concurred in the judgment.

**ORDER**

¶ 1    *Held*:  Defendant's waiver of counsel was knowingly and intelligently made where the trial court substantially complied with the admonishments in Supreme Court Rule 401(a); defendant's sentencing challenges are forfeited or without merit.

¶ 2    Following a jury trial, defendant Kelby Smith, who appeared *pro se*, was convicted of intimidation (720 ILCS 5/12-6(a)(5) (West 2016)), unauthorized video recording and live video transmission (720 ILCS 5/26-4(a-5) (West 2016)), and non-consensual dissemination of private sexual images (720 ILCS 5/11-23.5(b) (West 2016)). The trial court sentenced defendant to

consecutive prison terms of 10 years for intimidation and 3 years each for the recording and dissemination charges, for an aggregate sentence of 16 years' imprisonment. On appeal, defendant contends his waiver of counsel was not knowingly and intelligently made because the trial court failed to substantially comply with Illinois Supreme Court Rule 401(a) (eff. July 1, 1984) when it incorrectly advised him that the maximum sentence for intimidation was 5 years rather than 10 years and sentenced him to the maximum term of 10 years' imprisonment for that offense. Alternatively, defendant challenges his 16-year sentence arguing: (1) it is excessive; (2) the trial court erred in imposing consecutive sentences; and (3) the court considered improper evidence in aggravation. We affirm.

¶ 3    Defendant was charged with four counts of residential burglary, two counts of intimidation, three counts of unauthorized video recording and live video transmission, and one count of non-consensual dissemination of private sexual images. The charges rose from allegations that defendant had made unauthorized video recordings of his neighbor, T.M., who lived in the apartment below his, threatened to send the videos to T.M.'s contacts if she did not meet with him and pay him money, and sent photos of T.M. with her intimate parts exposed to one of her friends.

¶ 4    On June 12, 2018, defendant stated, "I'd like to fire my Public Defender and exercise my right to self-representation." Defendant said he had completed "[s]ome college" and previously served in the military but had no prior experience in court. The court stated that it believed people were "ill-advised" to represent themselves, and in this case, those reasons were "exponential" because defendant would not be able to view most of the evidence, which was almost all electronic.

¶ 5    The court advised defendant that the residential burglary charges were non-probationable Class 1 felonies with a minimum prison sentence of 4 years and a maximum sentence of 15 years.

Whether those sentences could be served consecutively would depend on the evidence. The court stated that the intimidation charge was a Class 3 felony punishable by probation, conditional discharge, or a prison sentence with a minimum term of two years and a maximum term of five years. The court further advised that the charges for unauthorized video recording and live video transmission and non-consensual dissemination of private sexual images were Class 4 felonies punishable by probation, conditional discharge, or prison sentences with a minimum term of one year and a maximum term of three years. Defendant confirmed he understood he had a right to counsel. The court admonished defendant that if he were indigent, counsel would be appointed for him at no cost, which had already been done. The court informed defendant that the prosecutor was an experienced attorney, and defendant's unfamiliarity with legal procedure could give the prosecution an advantage. It further stated that it would not appoint standby counsel or give defendant extra preparation time. The court told defendant it believed he was making a mistake in proceeding *pro se* and gave him two weeks to reconsider his decision.

¶ 6     On June 27, 2018, defendant stated that he wanted to proceed *pro se*. Defense counsel stated defendant had made his decision of sound mind, he had a plan, and he wanted to be in control of it. The court excused counsel and allowed defendant to proceed *pro se*.

¶ 7     On August 30, 2018, the court granted defendant's request to reappoint the public defender.

¶ 8     On January 7, 2019, the State filed a motion to present proof of other crimes evidence consisting of approximately 50 video recordings found on defendant's phone. Some videos depicted "window peeping" where unknown women were recorded without their knowledge through windows from outside their homes using their toilets and showers. There were a few images of defendant "upskirting" women. Defendant recorded his wife using the toilet and shower

without her knowledge. There were videos of M.H., who moved into T.M.'s apartment after T.M. moved out, using her shower and toilet. The State planned to call M.H. to testify. In addition, there were videos of different unknown women, all of whom were sleeping or unconscious, with defendant removing their undergarments and exposing their genitalia without their knowledge or consent. The trial court found the probative value of the evidence outweighed its prejudicial effect and allowed the State to present all the evidence except for the "upskirting" images.

¶ 9    On March 18, 2019, defendant filed a *pro se* motion for appointment of counsel other than the public defender. The trial court denied the motion. Defendant then stated that he wanted to represent himself. The trial court again admonished defendant pursuant to Rule 401 substantially similar to its previous admonishments. The court advised defendant of the charges and possible penalties, including that residential burglary had a maximum sentence of 15 years' imprisonment. The court again stated that the possible prison term for intimidation was between two and five years. The court advised defendant that if he were found guilty of more than one offense, consecutive sentences could be imposed if the court found it necessary for the protection of the public. Defendant confirmed he understood all the conditions and again stated that he wanted to represent himself. The trial court granted defendant's request.

¶ 10    On April 1, 2019, the prosecutor informed the court that she had shown defendant every video and photograph the State planned to present at trial. The prosecutor noted defendant was recently charged in a second case with similar offenses against M.H.

¶ 11    The State proceeded to trial on two counts of residential burglary and one count each of intimidation, unauthorized video recording and live video transmission, and non-consensual dissemination of private sexual images. The State nol-prossed all the remaining counts.

¶ 12    At trial, T.M. testified that in April 2015 she and her two young children moved into a second-floor apartment near 75th Street and Yale Avenue. T.M. did not know defendant and did not know he lived in the apartment above hers. In August 2015, T.M. was in her kitchen, topless and wearing only underwear, when she observed a flash in the window that faced her back porch. The porch was connected to the unit above hers by a common staircase.

¶ 13    On one occasion between August 2015 and August 2016, T.M. came home and noticed the back door leading to her porch was unlocked. In August 2016, T.M. observed a quarter-sized hole above the showerhead in her bathroom. She repeatedly filled the hole with tissue paper, and on one occasion, taped a credit card over the hole to cover it. Each time she later found the tissue paper or credit card lying in the middle of the bathtub, as though it had been pushed out or fell out of the hole. T.M. submitted a work order for maintenance to fix the hole. The day the hole was to be repaired, T.M. left her apartment for 10 minutes to run an errand. When she returned, her laptop was missing from her living room table. Her laptop contained her contact list and intimate photographs of her, including a close-up image of her breasts. T.M. assumed a worker entered her apartment without her permission and she complained to management. T.M. moved out of the apartment by the end of the month. The hole had not been repaired.

¶ 14    In December 2016, T.M. realized she was missing an old cell phone she had last seen in her former apartment. The phone contained her contact list and the same photograph of her breasts.

¶ 15    On March 7, 2017, T.M. received text messages from an unknown number containing four photographs – the same photo of her breasts, and three photos she had never seen depicting her walking topless in her kitchen and taking a shower. The sender stated that he had been paid to take the photos of her by someone she used to date, and that man did not pay the full amount. The

sender said if T.M. wanted the photos, she had to meet him at a hotel. The sender stated he knew where T.M. lived and worked, her social security number, and where she took her children every day. If T.M. did not pay him $700 for the photos, he would release a few photos "for everyone to see" at her children's school and T.M.'s job. He threatened to release photos every month. He claimed he could post the photos on her Facebook page. The sender implied someone had sold him the keys to her apartment, and if he had wanted to harm her, he could have entered her apartment while she was sleeping. He stated, "[a]ll those nights you thought someone was in your apartment, there was. And you are not crazy." The texts began coming from a second unknown number, but based on the context, T.M. knew they were from the same person. She never met the sender and did not pay him any money. T.M. was "terrified" and filed a police report.

¶ 16    The next day, T.M. received a phone call from an unknown person using a "robotic" voice. He identified himself as the person who sent her the text messages and wanted to meet with her. T.M. contacted the police. Per their advice, she changed her phone number.

¶ 17    A month later, T.M.'s friend, Moriah Stofer, told her someone had sent her a photo of T.M. The photo depicted T.M. taking a shower with her face and breasts clearly exposed.

¶ 18    T.M. identified numerous videos and photographs taken of her in her apartment. The bathroom images depicted her using the toilet, showering, and shaving. One image included her two-year-old daughter showering with her. Three images depicted T.M.'s cousin taking a shower. Images taken from outside T.M.'s kitchen window depicted T.M. topless while in her kitchen.

¶ 19    Moriah Stofer testified she received a text with two photos of T.M. topless from an unknown number. The sender told Stofer to tell T.M. she would be exposed and to contact him.

¶ 20    Chicago police detective Melissa Uldrych testified that T.M. gave her copies of the text messages and photos. Uldrych found that the two numbers from which the texts were sent were connected to defendant's email. Uldrych went to T.M.'s former apartment and observed a dime-sized hole above the showerhead. An apartment manager tore down the ceiling to look for cameras but found none. Uldrych met defendant in front of the apartment building. After being advised of his *Miranda* rights, defendant confirmed the email addresses were his. Defendant told police he paid maintenance personnel $100 to enter T.M.'s apartment. Defendant took a cell phone from T.M.'s closet and transferred her contacts and photos to his phone. Defendant admitted he photographed T.M. in her bathroom from a hole inside his closet and photographed her inside her home with her breasts exposed. Defendant stated he needed money and contacted T.M. to meet him at a hotel to pay him $300. He also contacted T.M.'s friend and told her to have T.M. contact him. Uldrych recovered a cellphone from defendant, and during a search of his apartment recovered six cellphones and a laptop. Inside a closet in defendant's apartment, a service panel had been removed, and when looking down, one could see into T.M.'s bathroom.

¶ 21    Fabiola Mejia-Montalto, a digital forensic analyst with the FBI, testified that she searched defendant's cellphone and found thousands of videos and photographs, as well as emails and text messages sent to T.M. with photos. Many of the videos showed women in showers. Searches had been done for information about anonymous texting, anonymous video calling, and scope cameras. The phone's SD card contained several photos and videos of T.M., T.M.'s cousin, M.H., and M.H.'s roommate. It also contained defendant's resume and several selfie photographs of him.

¶ 22    M.H. testified that in December 2016, she and a female friend, S.B., moved into the second-floor apartment in the building on Yale. Defendant lived above them. M.H. observed a small hole

in the ceiling above her shower. In August 2017, Uldrych called M.H. and asked if there were any holes in her bathroom ceiling. Uldrych showed M.H. four videos of M.H. and S.B. showering.

¶ 23    Defendant testified that he was never in T.M.'s apartment and never recorded her or anyone else in the bathroom or through a window. He stated that videos and images could be manipulated, and the fact they were found on his phone did not mean he created them. Defendant denied confessing to police. He denied taking T.M.'s phone and laptop and claimed several apartments had been burglarized, including his. Defendant claimed he had several arguments with the building maintenance man, after which defendant stole that man's phone. Defendant removed the SD card from that man's phone and transferred it to his own phone. The videos were on that card and defendant did not know they were there. Defendant denied committing any of the offenses.

¶ 24    The jury found defendant guilty of intimidation, unauthorized video recording and live video transmission, and non-consensual dissemination of private sexual images. The jury found defendant not guilty of residential burglary.

¶ 25    At sentencing, in aggravation, Mejia-Montalto testified there were additional videos on the SD card from defendant's phone that were not shown at trial which depicted a man having sex with a woman who appeared unconscious. Other videos depicted a person's hand removing undergarments from women who were not moving, then showing the women's genitalia. Mejia-Montalto identified a screenshot from one of the videos, marked as People's exhibit number three.

¶ 26    Joseph Ditalis, an investigator with the Cook County State's Attorney's Office, testified that he and the prosecutor met with defendant's wife, Dasha Smith. They showed Smith several videos of a man having sex with a woman who appeared unconscious. Smith identified herself as the woman and defendant as the man, noting his tattoos. Smith did not recall the incident and had

not consented to being videotaped. They also showed Smith a video of herself taking a shower. Smith was not aware she had been filmed. Smith declined to press charges against defendant.

¶ 27    T.M. read her victim impact statement in which she stated defendant's acts damaged her mentally and emotionally. She was terrified to use public restrooms, scared to live alone, and left lights on when she slept for fear someone was watching her. She felt tortured by defendant, embarrassed by the police and others viewing the videos, and lived in fear.

¶ 28    The prosecutor stated that following sentencing, she would dismiss defendant's remaining case, number 19 CR 3180, in which M.H. was the victim. She was going to "burn" that case in aggravation by having M.H. read her victim impact statement. M.H. stated that she was traumatized and felt defendant had raped her without physically touching her. Defendant's actions had emotionally and mentally damaged her, and the shame and embarrassment would last a long time. She always felt someone was watching her, and her life would never be the same.

¶ 29    In mitigation, defendant's stepfather, Marvin Searles, testified that defendant was a hard worker, family oriented, and his children needed him. Defendant's mother, Sharon Searles, testified that defendant was a good father who provided for his family, and his children needed him. He had never been in trouble with the law. Defendant began working for her when he was 13 and had been employed ever since. Defendant served in the army, went to school for heating and air conditioning, and had several certificates for operating heavy construction equipment.

¶ 30    The State argued in aggravation that defendant caused T.M. and M.H. severe psychological and emotional distress. He had also recorded T.M.'s cousin and children and M.H.'s roommate. The State noted that in the video of T.M. showering with her two-year-old daughter, defendant

"zoomed in on the child's private parts." The State requested consecutive sentences at the high end of the range, which was 4 to 16 years' imprisonment, to protect the public from his conduct.

¶ 31     The trial court acknowledged it misadvised defendant that the maximum sentence for intimidation was 5 years rather than 10 years and asked how it could sentence him to more than 5 years for that offense. The State pointed out that the court had advised defendant that the sentencing range for residential burglary was 4 to 15 years, which encompassed the 10-year term.

¶ 32     Defendant made a combined argument in mitigation and statement of allocution maintaining his innocence. He argued that the video with his wife was consensual. He further argued that the State failed to prove he recorded the other videos. Defendant claimed T.M. committed perjury and that the woman she identified as her cousin was not. Defendant noted he had been employed since he was 13 years old and provided for his wife and children. He claimed this case was "just one big misunderstanding" and he became "mixed up in this" because he took the maintenance man's phone, which was how the videos ended up on his phone. Defendant stated that he was sorry for what happened to the victims, but he "had nothing to do with these crimes."

¶ 33     The presentence investigation report (PSI) indicates that defendant had no criminal history. He graduated from high school and trade school where he received a certificate for heating and air conditioning. While in the army, he was arrested and charged with wrongful use of cocaine and marijuana for which he received a non-judicial punishment of a reduction in rank and discharge. Defendant was employed and working two jobs until his arrest.

¶ 34     The trial court stated that it reviewed the PSI, recalled the evidence from trial, and listened to the evidence and arguments in aggravation and mitigation. The court found that defendant engaged in his conduct for his own pleasure with no concern for the chronic and everlasting

detriment it caused to T.M. and M.H. The court found that T.M. and M.H. were "horribly victimized" by defendant, which was clear from their trial testimony and victim impact statements.

¶ 35    The court acknowledged it incorrectly admonished defendant that the maximum sentence for intimidation was five years. The court noted it also admonished him that the maximum term for residential burglary was 15 years. Therefore, defendant knew he faced a possible 15-year sentence on that charge alone. The court pointed out it told defendant his sentences could be served consecutively, and he confirmed he understood. Defendant therefore knew he faced a possible aggregate sentence of 26 years' imprisonment when he decided to represent himself. Accordingly, the court concluded it could sentence defendant up to 10 years for the intimidation offense.

¶ 36    The court expressly recognized that defendant had no criminal history except for the military charge, which it gave no consideration. The court found the offenses were three separate crimes that warranted separate sentences. It found the circumstances of the case egregious with a debilitating effect, confirmed by T.M.'s testimony and victim impact statement. The court further found that, pursuant to section 5-8-4(c) of the Unified Code of Corrections (Code) (730 ILCS 5/5-8-4(c) (West 2016)), consecutive sentences were required to protect the public from further criminal conduct by defendant. The court stated that it had already provided the basis for the consecutive terms. The court sentenced defendant to consecutive prison terms of 10 years for intimidation, and 3 years each for unauthorized video recording and non-consensual dissemination of private sexual images, for an aggregate sentence of 16 years' imprisonment.

¶ 37    After the court admonished defendant of his appeal rights, the State dismissed his remaining case, number 19 CR 3180, in which M.H. was the victim.

¶ 38    Immediately thereafter, defendant filed a motion to reconsider his sentence. Defendant argued his sentence was excessive, the court failed to consider probation, the sentence did not comport with alternatives to assist him with rehabilitation, or with his criminal and mental history, family situation, economic status, and education. The trial court denied the motion.

¶ 39    On appeal, defendant first contends his waiver of counsel was not knowingly and intelligently made because the trial court failed to substantially comply with Rule 401(a) when it incorrectly advised him that the maximum sentence for intimidation was 5 years rather than 10 years and sentenced him to the maximum term of 10 years' imprisonment for that offense. Defendant acknowledges he failed to object to the error and did not raise the issue in his posttrial motion. He argues that this court should find the issue is not forfeited because it should not be his duty to ensure his admonishments were correct. Alternatively, he argues that a Rule 401(a) violation is reviewable as plain error because a defendant's right to counsel is fundamental.

¶ 40    The State responds that the issue is forfeited and plain error does not apply because no error occurred where the trial court's admonishments substantially complied with Rule 401(a). The State acknowledges the trial court's admonishment was incorrect. It argues, however, that the court correctly advised defendant that the maximum sentence for residential burglary was 15 years, and with that knowledge, defendant decided to represent himself. The State argues defendant was not prejudiced by the incorrect admonishment where his decision to waive counsel did not rely on the potential maximum sentence, he was motivated to represent himself throughout the proceedings, and he does not claim he would not have waived counsel had he been advised of the correct term.

¶ 41    This court has repeatedly held that the trial court's failure to comply with Rule 401(a) denies a defendant his fundamental right to be represented by counsel, and therefore, such claims

are reviewable as plain error. *People v. Pike*, 2016 IL App (1st) 122626, ¶ 109; *People v. Black*, 2011 IL App (5th) 080089, ¶ 24 (and cases cited therein); *People v. Jiles*, 364 Ill. App. 3d 320, 328 (2006). Although defendant did not preserve his contention, we consider his argument under the plain error doctrine (Ill. S. Ct. R. 615(a) (eff. Jan. 1, 1967)).

¶ 42     Pursuant to Rule 401(a), the trial court may not allow a defendant to waive counsel without first admonishing him and determining that he understands: (1) the nature of the charges; (2) the minimum and maximum sentences, including any penalty he may be subjected to due to prior convictions; and (3) he has a right to counsel, and if indigent, to have counsel appointed for him. Ill. S. Ct. R. 401(a) (eff. July 1, 1984). The purpose of this rule is to ensure defendant's waiver of counsel is voluntarily, knowingly, and intelligently made, and where it is, his decision to represent himself must be honored. *People v. Haynes*, 174 Ill. 2d 204, 235, 241 (1996).

¶ 43     Our supreme court has long held that strict, technical compliance with Rule 401(a) is not required, and instead, substantial compliance is sufficient to effectuate a valid waiver of counsel where the record shows the waiver was made knowingly and voluntarily, and defendant's rights were not prejudiced by the admonishment received. *People v. Wright*, 2017 IL 119561, ¶ 41. Whether the trial court's admonishments substantially complied with Rule 401(a) is a question of law we review *de novo*. *Pike*, 2016 IL App (1st) 122626, ¶ 114.

¶ 44     We find our supreme court's analysis in *Haynes* governs our determination in this case. In *Haynes*, the defendant was charged with three counts of first degree murder and one count of burglary. *Haynes*, 174 Ill. 2d at 211. Pursuant to Rule 401(a), the trial court admonished the defendant about the minimum and maximum penalties for murder, including the death penalty. *Id.* at 238. The court did not advise the defendant of the penalties for burglary. *Id.* at 242. The

defendant waived counsel, and following trial, was found guilty of all counts and sentenced to death. *Id.* at 211-12. On direct appeal to our supreme court, the defendant argued that his waiver of counsel was not knowingly and intelligently made because the trial court failed to substantially comply with Rule 401(a) when it neglected to admonish him of the minimum and maximum sentences for burglary. *Haynes*, 174 Ill. 2d at 242. The supreme court found that the omitted information did not invalidate the defendant's waiver of counsel. *Id.* at 243. The court pointed out that the defendant was fully aware of the possible sentences for the most serious charge, first degree murder, including the death sentence. *Id.* The court found it was much less important that the defendant had specific knowledge of the minimum and maximum sentences for the significantly less serious burglary offense. *Id.* The court held that, although the trial court omitted the sentences for burglary, its admonishments substantially complied with Rule 401(a). *Id.*

¶ 45    In addition, the supreme court found the record demonstrated that the defendant's decision to waive counsel was freely, knowingly, and intelligently made. *Id.* The defendant had repeatedly expressed his desire to represent himself. *Id.* at 243-44. He understood the nature of the charges, the role of an attorney, and that the death penalty was a possible sentence. *Id.* at 244. The record showed the defendant was repeatedly advised of his right to counsel and received assistance from appointed counsel prior to trial. *Id.* The court concluded that the defendant knew and understood all the matters encompassed by Rule 401(a), and thus, his waiver of counsel was valid. *Id.*

¶ 46    Following *Haynes*, here, we find the trial court's admonishments to defendant substantially complied with Rule 401(a). The most serious offense defendant was charged with was residential burglary. The trial court correctly admonished defendant that the maximum sentence for residential burglary was 15 years' imprisonment. The record thus shows that defendant was fully aware of

the possible maximum sentence for the most serious charge. *Haynes*, 174 Ill. 2d at 243. The court also correctly advised defendant that the maximum sentence for both the video recording and dissemination offenses was three years' imprisonment. In addition, the court advised defendant that his sentences could be served consecutively. Therefore, although the trial court misadvised defendant of the maximum sentence for intimidation, defendant was aware that he was facing a possible aggregate sentence of 26 years' imprisonment when he decided to waive counsel.

¶ 47     We find no merit in defendant's arguments that he suffered prejudice when the court sentenced him to 10 years for intimidation and that he was under a mistaken apprehension that if he was found not guilty of residential burglary, his maximum aggregate sentence would be 11 years. The purpose of Rule 401 is to ensure that, prior to waiving his right to counsel, defendant understands the charges against him and the consequences if found guilty of those charges. *People v. Meeks*, 249 Ill. App. 3d 152, 171-72 (1993). Here, the record shows defendant understood that if he was found guilty of the four charges, he faced a possible maximum sentence of 26 years' imprisonment. With that knowledge, defendant chose to waive counsel. Defendant was ultimately sentenced to 16 years' imprisonment – 10 years below the maximum of what he had been advised. Based on this record, we cannot find that the trial court's admonishments prejudiced his right to counsel. The fact that the jury found defendant not guilty of residential burglary is of no import when determining whether his pretrial waiver of counsel was knowingly made.

¶ 48     Moreover, the record demonstrates that defendant's decision to waive counsel was freely, knowingly, and intelligently made. Defendant had stated, "I'd like to fire my Public Defender and exercise my right to self-representation." Defendant informed the court that he had completed "[s]ome college" and served in the military. Defendant confirmed he understood he had a right to

counsel, and that counsel would be appointed for him if he were indigent, which had already been done. The trial court warned defendant that the prosecutor was an experienced attorney and that defendant's unfamiliarity with legal procedure could give the prosecution an advantage. The court further advised that it would not appoint standby counsel or give defendant extra preparation time. The court repeatedly told defendant that it believed self-representation was a mistake. It pointed out that almost all the evidence in this case was electronic and defendant would not have access to view it in jail. The court gave defendant two weeks to reconsider his decision. When defendant returned to court, he confirmed he wanted to proceed *pro se*. Defense counsel stated that defendant had made his decision of sound mind, he had a plan, and he wanted to be in control of it. The court allowed defendant to proceed *pro se*, then reappointed the public defender at defendant's request.

¶ 49       Thereafter, defendant filed a *pro se* motion for appointment of counsel other than the public defender, which the trial court denied. Defendant stated that he wanted to represent himself. The trial court again admonished defendant pursuant to Rule 401 substantially similar to its previous admonishments, including the possible penalties, and possibility of consecutive sentences. Defendant confirmed he understood all the conditions and again stated that he wanted to represent himself. The trial court granted his request. We further note that at sentencing, when the court became aware of the incorrect admonishment, it analyzed the circumstances and concluded the error was harmless. Defendant did not object, argue, or assert that he would not have waived counsel had he been advised of the 10-year maximum for intimidation. There is no indication in the record that the trial court's erroneous admonishment had any effect on defendant's decision to waive his right to counsel. Accordingly, we conclude that defendant's waiver of counsel was valid.

¶ 50    Defendant next contends his 16-year sentence is excessive because the trial court imposed the maximum sentence for each of the three offenses. Defendant argues that he was convicted of nonviolent offenses, had no criminal background, and had strong potential for rehabilitation. He claims the trial court undervalued his mitigating evidence which showed he was 33 years old and married, an army veteran, had a long employment history including two jobs at the time of his arrest, and supported his children financially and emotionally. Defendant asserts that he did not commit the "worst version" of intimidation because he did not threaten physical harm or damage to property, he did not "act out" the full scope of his threat, and he committed a "relatively mild version" of dissemination where he sent two photos to one of T.M.'s longtime friends.

¶ 51    Intimidation is a Class 3 felony with a sentencing range of 2 to 10 years' imprisonment. 720 ILCS 5/12-6(b) (West 2016). The video recording and dissemination offenses are both Class 4 felonies with sentencing ranges of one to three years' imprisonment. 720 ILCS 5/26-4(a-5), (d)(2) (West 2016); 720 ILCS 5/11-23.5(b), (f) (West 2016); 730 ILCS 5/5-4.5-45(a) (West 2016). The trial court has broad discretion in imposing an appropriate sentence, and where, as here, that sentence falls within the statutory range, it will not be disturbed on review absent an abuse of discretion. *People v. Jones*, 168 Ill. 2d 367, 373-74 (1995). An abuse of discretion exists where a sentence is at great variance with the spirit and purpose of the law or is manifestly disproportionate to the nature of the offense. *People v. Alexander*, 239 Ill. 2d 205, 212 (2010).

¶ 52    The Illinois Constitution mandates criminal penalties be determined according to the seriousness of the offense and with the objective of restoring the offender to useful citizenship. Ill. Const. 1970, art. I, § 11; *People v. Ligon*, 2016 IL 118023, ¶ 10. In light of these objectives, "[t]he trial court is charged with fashioning a sentence based upon the particular circumstances of the

case, including the nature of the offense and the character of the defendant." *People v. Fern*, 189 Ill. 2d 48, 55 (1999). The court's sentencing decision is entitled to great deference because, having observed the defendant and the proceedings, it had the opportunity to weigh defendant's demeanor, credibility, general moral character, mentality, habits, social environment, and age. *Alexander*, 239 Ill. 2d at 213. "The sentencing judge is to consider 'all matters reflecting upon the defendant's personality, propensities, purposes, tendencies, and indeed every aspect of his life relevant to the sentencing proceeding.' " *Fern*, 189 Ill. 2d at 55 (quoting *People v Barrow*, 133 Ill. 2d 226, 281 (1989)). The trial court need not give defendant's potential for rehabilitation greater weight than the seriousness of the offense. *People v. Anderson*, 325 Ill. App. 3d 624, 637 (2001).

¶ 53    Here, we find no abuse of discretion by the trial court in sentencing defendant to the maximum prison terms for each offense, which fall within the statutory ranges. At sentencing, the State presented aggravating evidence that defendant's phone contained additional sexually explicit videos of multiple women who appeared unconscious and unaware they were being recorded. Ditalis testified that defendant's wife identified herself and defendant in several of those videos and she was unaware she had been filmed. T.M. and M.H. presented victim impact statements describing how defendant's acts had severely traumatized them mentally and emotionally, causing them to live in fear and embarrassment with long-term effects. The State pointed out that defendant had also recorded T.M.'s cousin and children and M.H.'s roommate while they were showering. Defendant presented mitigating evidence from his parents that he was a hard worker, family-oriented, and that his children needed him. Defendant argued that the State failed to prove he recorded the videos, maintained his innocence, and claimed this case was "just one big misunderstanding." The PSI contains all the mitigating evidence defendant points to on appeal.

¶ 54    The trial court expressly stated that it reviewed the information contained in the PSI, recalled the evidence from trial, and listened to the evidence and arguments in aggravation and mitigation. It specifically noted that defendant had no criminal history. The court found, however, that the circumstances in this case were egregious. It found that T.M. and M.H. were "horribly victimized" by defendant, and he had no concern for the chronic and everlasting trauma he caused them. The court emphasized the seriousness of defendant's conduct and concluded that a lengthy prison term was necessary to protect the public. The record thereby indicates that the trial court was well aware of defendant's mitigating evidence but found the seriousness of the offenses and defendant's lack of remorse and moral character far outweighed his potential for rehabilitation.

¶ 55    This court will not reweigh the sentencing factors or substitute our judgment for that of the trial court. *Alexander*, 239 Ill. 2d at 213. Based on the record before us, we cannot say that the sentence imposed by the trial court is excessive, manifestly disproportionate to the nature of the offense, or that it departs significantly from the intent and purpose of the law. *Fern*, 189 Ill. 2d at 56. Accordingly, we find no basis to disturb the trial court's judgment.

¶ 56    Defendant next contends the trial court erred when it concluded consecutive sentences were necessary to protect the public. He repeats his assertions that he did not commit the most serious versions of the offenses, the offenses were nonviolent, he did not threaten or cause physical harm, and his mitigating evidence showed his strong potential for rehabilitation. Defendant argues that, although he did not specifically challenge the consecutive sentences in his motion to reconsider sentence, his claim that the sentences were excessive sufficiently raised the issue. Alternatively, defendant argues the issue may be reviewed under both prongs of the plain error doctrine.

¶ 57    The State responds that defendant forfeited this issue and that the plain error doctrine does not apply because no error occurred where the trial court determined consecutive sentences were necessary to protect the public. In addition, the State points out that defendant is not arguing that the trial court failed to balance his rehabilitative potential with the need to protect the public, but instead, merely disagrees with the court's conclusion following that analysis, which is not a cognizable ground for relief under the abuse of discretion standard.

¶ 58    It is well settled that to preserve a sentencing error for review, both a contemporaneous objection during the sentencing hearing and a written postsentencing motion raising the issue are required. *People v. Hillier*, 237 Ill. 2d 539, 544 (2010). Here, defendant made no objection during the sentencing hearing and did not challenge the consecutive sentences in his motion to reconsider sentence. Consequently, the issue is forfeited. *Id.* at 544-45.

¶ 59    Defendant argues that his claim may be reviewed under the plain error doctrine. The plain error doctrine is a limited and narrow exception to the forfeiture rule which can only be invoked after defendant first demonstrates that a clear or obvious error occurred. *Id.* at 545. Thereafter, defendant must show that the evidence at the sentencing hearing was closely balanced, or that the error was so egregious that he was denied a fair sentencing hearing. *Id.* The burden of persuasion is on defendant, and if he fails to meet that burden, his procedural default will be honored. *Id.*

¶ 60    Pursuant to section 5-8-4(c)(1) of the Code, the trial court may impose consecutive sentences if, regarding "the nature and circumstances of the offense and the history and character of the defendant," the court determines "consecutive sentences are required to protect the public from further criminal conduct by the defendant, the basis for which the court shall set forth in the record." 730 ILCS 5/5-8-4(c)(1) (West 2016). The record must indicate that the trial court

adequately balanced the mitigating factors and defendant's potential for rehabilitation against the need to protect the public. *People v. Phagan*, 2019 IL App (1st) 153031, ¶ 116. Due to the fact-based balancing, the trial court's determination is reviewed for an abuse of discretion. *Id.*

¶ 61    Here, the record reveals the trial court considered the mitigating evidence and defendant's potential for rehabilitation, balanced those factors against the circumstances and seriousness of defendant's conduct, as well as defendant's character, and determined consecutive sentences were required to protect the public from further criminal conduct by defendant, who professed that this case was "just one big misunderstanding." The record further indicates that the court explicitly set forth the basis for its determination, emphasizing the seriousness of the offenses and the lasting trauma defendant caused to his victims. Based on this record, we find no abuse of discretion by the trial court in making its determination. We conclude that the trial court did not err when it imposed consecutive sentences. Since no error occurred, the plain error doctrine does not apply, and we honor defendant's forfeiture of the issue. *Hillier*, 237 Ill. 2d at 545-46.

¶ 62    Defendant next contends the trial court relied on improper aggravating evidence at sentencing, specifically, M.H.'s victim impact statement and the State's sentencing exhibit number three, which was a screenshot from one of the videos. The parties agree defendant forfeited these challenges. Defendant argues his claims are reviewable under both prongs of the plain error doctrine. The State responds that the plain error doctrine does not apply because no error occurred.

¶ 63    The ordinary rules of evidence are relaxed at sentencing to allow the trial court to consider the fullest information possible regarding the defendant's life and characteristics. *People v. Jackson*, 149 Ill. 2d 540, 547-48 (1992). The court may search anywhere, within reason, for facts that tend to aggravate or mitigate the offense. *Id.* at 548. The only requirement for admitting

evidence at sentencing is that it is relevant and reliable, as determined by the trial court's sound discretion. *People v. Lovejoy*, 235 Ill. 2d 97, 152 (2009).

¶ 64 Regarding M.H.'s victim impact statement, defendant argues the court erred when it allowed M.H. to read her statement because she was not a "crime victim" as defined by the Rights of Crime Victims and Witnesses Act (Act) (725 ILCS 120/1 *et seq.* (West 2016)), nor a person "impacted by the crime" committed in this case. Defendant claims that under the plain meaning of the statutory language, neither M.H. nor T.M. qualified as "crime victims" whose impact statements the court was required to consider because he was not convicted of a violent crime.

¶ 65 Defendant has misinterpreted the Act. When interpreting a statute, our goal is to ascertain and give effect to the true intent of the legislature by giving the language in the statute its plain and ordinary meaning. *People v. Casler*, 2020 IL 125117, ¶ 24. We must view the statute as a whole, construing words and phrases in light of other relevant statutory provisions, and giving each word, clause, and sentence a reasonable meaning, not rendering any language superfluous. *Id.* "The court may consider the reason for the law, the problems sought to be remedied, the purposes to be achieved, and the consequences of construing the statute one way or another." *Id.*

¶ 66 The Act defines a "crime victim," in relevant part, as "any natural person determined by the prosecutor or the court to have suffered direct physical or psychological harm as a result of a violent crime perpetrated or attempted against that person[.]" 725 ILCS 120/3(a) (West 2016). Pursuant to the Act, "[a] crime victim shall be allowed to present an oral or written victim impact statement in any case in which a defendant has been convicted of a violent crime[.]" 725 ILCS 120/6(a) (West 2016). The Act further provides that the trial court "may allow persons impacted by the crime who are not victims under subsection (a) of Section 3 of this Act to present an oral or

written statement." *Id.* Significant here, the Act defines "violent crime" as including "any offense involving sexual exploitation, sexual conduct or sexual penetration[.]" 725 ILCS 120/3(c)(2) (West 2016). Moreover, the Act expressly states, "[n]othing in this Act shall create a basis for vacating a conviction or a ground for relief requested by the defendant in any criminal case." 725 ILCS 120/9 (West 2016).

¶ 67    Here, M.H. testified at trial as an other crimes victim and identified four videos found on defendant's phone that depicted her and her roommate showering in their bathroom. M.H. testified that she never gave defendant permission to enter her apartment or record her. The prosecutor informed the court that defendant had been charged with similar crimes in which M.H. was the victim in case number 19 CR 3180. The prosecutor elected to dismiss that case and presented M.H.'s victim impact statement for that case as aggravating evidence in this case. The offenses in this case and the case with M.H. both involved sexual conduct, and thus, met the Act's definition of "violent crime." The record clearly demonstrates that the prosecutor and trial court determined that M.H. suffered direct psychological harm as a result of defendant's conduct perpetrated against her, which constituted a violent crime, and therefore, M.H. met the statutory definition of "crime victim," as did T.M. As a crime victim, M.H. was allowed to present her victim impact statement to the court at sentencing. The trial court did not err when it allowed and considered M.H.'s statement, and defendant cannot use that consideration as a ground for relief on appeal.

¶ 68    Finally, defendant challenges the State's use of its sentencing exhibit number three, a screenshot from one of the videos depicting a person's hand carefully removing undergarments from a woman who was not moving, then showing the woman's genitalia. Defendant argues the evidence was too unreliable to be admitted as aggravating evidence because there was no evidence

as to who the unknown woman in the video was, or if the encounter was, in fact, nonconsensual. The State responds that the exhibit met the minimum threshold for reliability where the image was found on the SD card from defendant's phone where other evidence of his criminal voyeurism was stored, including videos of him having sex with his unconscious wife. The State points out that the evidence was subject to cross-examination, but defendant declined the opportunity. As noted above, defendant forfeited this challenge but claims it is reviewable as plain error.

¶ 69    Here, we find no abuse of discretion by the trial court in allowing the screenshot to be used as aggravating evidence. The court granted the State's motion to use this same evidence as other crimes evidence during trial, finding its probative value outweighed its prejudicial effect. Hence, the trial court had determined prior to trial that the evidence was relevant and reliable. The State elected not to present these particular videos at trial, and instead, presented the evidence in aggravation at sentencing where the rules of evidence were more relaxed. Mejia-Montalto testified that the video from which the screenshot was taken was found on defendant's cellphone along with thousands of other videos and photographs of women, including those of T.M. Defendant admitted to Detective Uldrych that he had taken the photographs of T.M. It was within the trial court's sound discretion to decide whether the evidence was reliable, and based on this record, we find no error in the court's conclusion. *Lovejoy*, 235 Ill. 2d at 152. Accordingly, the plain error doctrine does not apply, and we honor defendant's forfeiture of the issue. *Hillier*, 237 Ill. 2d at 545-46.

¶ 70    For these reasons, we affirm the judgment of the circuit court of Cook County.

¶ 71    Affirmed.